# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00566-CR

**Adrian D. Lagunas, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
## NO. CR2003-104, HONORABLE GARY L. STEEL, JUDGE PRESIDING

## O P I N I O N

After a jury trial, appellant Adrian Lagunas was convicted of aggravated kidnapping and burglary of a habitation, and the district court sentenced him to confinement of twenty years and thirty-five years, respectively. *See* Tex. Pen. Code Ann. §§ 20.04(a), 30.02(a) (West 2003). In this appeal, we will consider Lagunas's claim that he was denied his Sixth Amendment right of confrontation with regard to hearsay testimony from the complainant's four-year-old child that the district court admitted as an excited utterance, a contention that implicates *Crawford v. Washington*, 541 U.S. 36 (2004). Lagunas also argues that the trial court abused its discretion in its application of the excited utterance hearsay exception, that the evidence is legally insufficient to support a conviction for burglary or for aggravated kidnapping, and that the evidence is factually insufficient

to prove Lagunas's identity as the person who committed the acts alleged. We will affirm the judgment of the district court.

**BACKGROUND**

The events from which Lagunas's convictions arose occurred in the late evening of June 22 or early morning of June 23, 2000, allegedly beginning in a two-bedroom house owned by Ignacias and Apolonio Cantu on South Hackberry in New Braunfels. The following facts are undisputed. The Cantus occupied one of the two bedrooms but were not present the evening in question. M.M., a 22-year-old woman and the complainant in this case, was staying in the other bedroom along with her two children, four-year-old D.M. and two-year-old R.M. C.M., the Cantus' grandson, was engaged to M.M. at that time, but was incarcerated on the night in question. A daughter of the Cantus, Yolanda Lagunas, was married to Lagunas and was also C.M.'s aunt. There was disputed testimony regarding whether the Lagunases were also staying in the living room of the Cantus' house at the time, but it is undisputed that they were keeping some belongings there and that at least Yolanda had access to the house. The Cantus kept a key hidden outside a side door to enable certain family members to have access to the house.

At approximately 1:45 a.m. on July 23, New Braunfels police received a 911 call from M.M. She had called from a house at 561 Schmidt Avenue. Shortly thereafter, Officer Christopher Peltier arrived at that house and reported finding M.M. "hysterical," "crying," and with clothing and a towel knotted around her neck and head, and socks tightly tied around her wrists. Blood flow appeared to be restricted in her hands, and she claimed to be in pain. The knit shirt around her head and neck was tied so firmly into her hair that EMS later had to cut her hair to

2

remove it.  M.M. did not have a shirt on, but several articles of clothing were tied to her back brastraps.  She was wearing grey sweat pants.  Her face was swollen, red, and discolored.

Officer Peltier further recounted that M.M. had reported that she was awakened thirty minutes after she went to sleep by a man who covered her mouth with his hand.[1]  She claimed that she did not see the man but recognized his voice as that of Lagunas.[2]  She initially thought that Yolanda Lagunas might have been playing a joke on her because Yolanda was a good friend and liked to play jokes.  But, when she realized that the episode was not a joke because of the aggressiveness of the actions, she kicked to free herself and ran for the bathroom.  The man caught her, hit her repeatedly with a closed fist, and forced her into the living room.  She visually recognized the man as Lagunas.  He then bound M.M.'s hands in socks, removed her shirt, tied clothes to her brastraps, tied a plastic sack and a t-shirt over her head, and forced her out of her house and into the passenger seat of her car.  The pair drove off.  M.M. told Officer Peltier that, once the car stopped, she was able to uncover her head, unlock the car door, and run away.  She ran through an open door in the house directly across the street and called 911.  This house was the 561 Schmidt location where Officer Peltier later found her.  Officer Peltier never found the plastic bag, but he did testify that he saw M.M.'s car parked across the street from 561 Schmidt Avenue, facing the wrong direction on the road.  Lagunas's parents lived in the house in front of which the car was parked.

Michael Ulbrich, a firefighter and paramedic for New Braunfels Fire Department, arrived at the 561 Schmidt Avenue house at 2:13 a.m.  He examined M.M. and recorded trauma to

---

[1] The occasional lack of clarity in M.M.'s accounts of the incident, summarized above, reflects the evidence at trial.

[2] However, Officer Peltier testified that he had not recorded in his incident report that M.M. had identified Lagunas.

the head with swelling and redness around the head and on both cheeks. Ulbrich classified M.M.'s injuries as serious and potentially life-threatening, indicating several blows to the head and face, and expressed doubt that someone could inflict such serious wounds on themself.[3] However, M.M. refused treatment.

When M.M. expressed concern about her unsupervised children, Officer John Sullivan was dispatched to the Cantu house. Upon arriving, Sullivan noted that the front door was slightly ajar. He entered using a flashlight and searched for the bedroom, where he had been advised that the children were located. Sullivan found two children, D.M., a girl about four years old, and R.M., a boy of about two years, lying in the bed in M.M.'s darkened bedroom. R.M. was asleep.

Before Officer Sullivan took the stand, Lagunas's counsel objected to the State eliciting testimony from Sullivan regarding statements made by D.M. Counsel urged that "we would still want to make sure that the State doesn't go into that, because we feel that the testimony is still inherently unreliable that a four-year-old girl makes when she is sleeping at night and woken up." Noting that it had "imposed an in limine on this area," the district court deferred ruling pending further testimony. Sullivan then testified that, when he entered the room,

> Officer Sullivan: [D.M.] pulled the covers up to her chest, and I could see her close her eyes. As she was closing her eyes, I could see the skin around them bunching up like she was just asleep or pretending to close her eyes. She was physically closing her eyes and bunching up the skin around it.
>
> State: Okay. Did she abruptly pull the covers up?

---

[3] On cross-examination, Ulbrich admitted that he could not determine whether or not the wounds were self-inflicted.

4

Officer Sullivan: She pulled the covers up to her chest and she left it at that point. And she didn't make any other movements until I identified myself to her.

State: Okay. Did you tell her you were a police officer?

Officer Sullivan: Yes, sir, I did.

State: Did she then open her eyes?

Officer Sullivan: She did.

State: Did you try to calm her down?

Officer Sullivan: Yes, sir, I did.

State: When you were making your contact with her, you said she was terrified. Did she cry?

Officer Sullivan: She wasn't crying, initially. I asked her what her name was.

State: Okay. But when you were talking to her, did she cry?

Officer Sullivan: Yes, sir, she did cry.

State: Did she appear upset?

Officer Sullivan: Yes, sir, she did.

State: Okay. The squinting of her eyes and abruptly pulling the covers over her and faking like she was asleep and crying, did she appear to be under the stress of some traumatic event?

Officer Sullivan: Yes, sir, she did.

Based on this testimony, the district court ruled that any statements made by D.M. to Officer Sullivan were excited utterances and overruled Lagunas's objection. The State then elicited the following testimony:

5

State:           Did you ask the little girl her name?

Officer Sullivan:  Yes, sir.

State:           What did she say her name was?

Officer Sullivan:  [D.M.]

State:           Did you ask her whether or not everything was okay?

Officer Sullivan:  Yes, sir, I did.

State:           How did she respond?

Officer Sullivan:  No, that it wasn't.  Her mommy was dead.

State:           Did she say anything else?

Officer Sullivan:  I asked her—I believe my exact words—well, I asked her what happened to her mommy.  And she stated that "A bad man had killed her and took her away."  That's what the four-year-old little girl told me.

State:           Okay.  Was she crying when she was telling you this?

Officer Sullivan:  Yes, sir.  As I began to ask her questions about what had happened—about what happened to mommy, she began to cry hysterically.

State:           Did you try to—did you know the whereabouts of her mother?

Officer Sullivan:  Yes, sir, I did.

Officer Sullivan then told D.M. that her mother was "with other police officers," and she then calmed down.

After other police officers arrived, Officer Sullivan looked around the Cantus' house. He noticed bunched-up carpet on the floor and clothes scattered across the living room, which

6

indicated to him that a struggle had taken place. In addition, he found an unsecured but closed rear door. On the ground near the door on the outside, he found a hasp that had been pried loose from the door.[4] Sullivan never found a padlock. He did not find any other signs of forced entry, nor did he recover any fingerprints. In the living room, Sullivan found a citation[5] issued to Lagunas by the New Braunfels Police Department as well as various articles of men's and women's clothing.

At trial, M.M. testified that she stayed in a room in the Cantus' house where she lived with her then-fiancé, C.M., and her children. Lagunas, his wife, and his children had moved their belongings into the house but were not staying there and had never spent the night. On the night in question, the Cantus were on vacation in Las Vegas, and M.M. had not given Lagunas permission to enter the premises. To her knowledge, Lagunas was not allowed into the house without his wife. There was a key on the outside patio, which family members used to enter the house. M.M. testified that she had known Lagunas for three years, and that she had conversed with him and heard his voice on many occasions before the incident.

M.M. further testified that, following a birthday party she attended with her children, she came home around midnight, put her children to bed, and washed a load of laundry. She laid down next to her children and fell asleep, only to be awakened by "someone standing by the bed." At first she thought it was Yolanda Lagunas playing a trick on her, but the person came towards her and began to touch her face and strangle her. She did not scream because she was concerned that

---

[4] A hasp is a long strip of metal with a hole in the middle that fits over a metal bolt. It is used to lock doors with a padlock. During cross-examination, Lagunas challenged Officer Sullivan's statement that the hasp had been found outside, pointing to the officer's report that reflected that he found the hasp on a couch in the living room.

[5] The record does not reflect the offense for which Lagunas was issued this citation.

7

she would awaken and scare her children. At that point, she recognized Lagunas, even though he had not yet said anything. M.M. attempted to push him off and fled into the living room, but Lagunas pursued her, grabbed her, and yanked off her shirt by the bathroom door. He then tackled her to the ground in the living room, pinned her, and repeatedly hit her in the face with his fists. After reaching for clothes in the living room, he tied her arms behind her back with a pair of socks and covered her mouth with clothing. Lagunas continued to strike M.M.'s face. He then rose, went into the kitchen, and searched around the drawers and cabinets. M.M. attempted to take this opportunity to escape. However, she could not open the front door with her hands restricted, and Lagunas hurried back to the living room. M.M. testifies to having visually identified Lagunas at this moment; she claimed he was wearing blue jean shorts, a white tank top and a cap.[6] He again pushed her to the floor and continued to hit her, and M.M. still maintained her silence in order to protect her children. Lagunas then tied her hands together tighter and tied her feet to her arms so that she was bent backwards into a "U" position. Over the shirt around her head, he tied a brown plastic HEB grocery bag. She maintained her ability to breathe by chewing a hole through the sack. After poking M.M. in her back with a "sharp, thin object," which M.M. thought to be a knife, Lagunas forced M.M. to tell him the location of her keys. He picked up her purse and took out the keys and money.

M.M. further testified that Lagunas untied her legs, helped her up, and told her not to "say anything" or "something would happen." At this point the sack had loosened, and she could see on the ground where she was going. He forced her into the passenger side of her car, told her

---

[6] On cross-examination, Lagunas pointed out the discrepancy between M.M.'s testimony that she saw Lagunas and her original statement to the police that she only identified him by voice.

to scoot back, and to put her head down. The bag loosened further, and M.M. testified that she could see Lagunas in the car. The two drove to Schmidt Avenue, where he stopped, got out of the car, and opened a gate. She had loosened the socks around her hands, and, when she heard the gate open, she ripped the bag and shirt off of her head, unlocked the door, and escaped running. Having recognized the house in front of which the car was parked to be that of Lagunas and his parents, she ran to the house across the street, 561 Schmidt, screaming for help. She then phoned the police.

Officer Sean Gabbard of the New Braunfels Police Department testified that he interviewed M.M. at the station two days after the alleged kidnapping. M.M. told him that she had seen her attacker's face and heard his voice, and identified him as Lagunas. Despite becoming visibly upset, she also immediately picked Lagunas out of a six-man photographic lineup.

Lagunas presented five witnesses in his defense. Lagunas's mother, Oralia Lagunas, testified that she resides at 2604 Morningside Drive. That address is on the corner of Schmidt and Morningside, is directly across from 561 Schmidt, and was the house in front of which Lagunas parked M.M.'s car. On July 23, 2000, Oralia Lagunas arrived home from a church conference at 12:30 a.m. When she initially arrived, Lagunas was not there but had taken his father's truck somewhere. By the time she had finished putting some paperwork away and taking a shower, at almost 1:00 a.m., her son had returned home and had a conversation with her about her day. She then went to bed. She testified that at this time Lagunas was living with his wife and not at the Morningside residence. Later that night, two policemen knocked on her door and asked for Lagunas. She told them that "he was here a minute ago," invited them in and did not prevent them from

entering.[7] They asked her if she owned the vehicle parked outside (M.M.'s car), and she replied that she did not. She did not remember the officers asking her to search the premises. When she saw Lagunas the next day, she told him to "go and talk and straighten this thing out." He responded by saying that the police would "put him in jail because of child support" and that he had an outstanding warrant. She testified that M.M. and Lagunas knew each other, and that M.M. and her ex-fiancé had been to her house "a couple of times."

David Busch, a private investigator, testified that the distance between Lagunas's parents' house on Morningside Drive and the Cantus' house on South Hackberry was approximately nine-tenths of a mile. To walk normally the distance each way would take between seventeen and nineteen minutes, and to drive (accounting for construction at the time and traffic) would take four minutes. Lieutenant John Villarreal of the New Braunfels Police Department testified that none of the fingerprints lifted from M.M.'s car matched those of Lagunas.

Yolanda Lagunas, Lagunas's wife, testified that her parents, the Cantus, were the owners of the house on South Hackberry and that she, Lagunas, and their children were living in that house at the time of the incident. They kept possessions at the house, including clothes, and slept in the living room. Yolanda Lagunas asserted that Lagunas had permission from her parents to be in the house, even when she was not there; in fact, she testified that normally during the day she worked while he slept at the house and that he worked the night shift. Lagunas and his wife usually entered the house through the side door. There was a key for that door under a flower pot that she

---

[7] Officer Peltier had testified that Oralia Lagunas prevented the policemen from entering her home.

and Lagunas used; however, she claimed the door was usually kept unlocked. Yolanda Lagunas also testified that Lagunas and M.M. were acquainted, had spent time together in a group during a camping trip, and each knew what the other looked like. She then testified that, during the night of the incident, she saw Lagunas in his father's truck with a friend. She claimed that M.M. was staying "off and on" at the Cantus' house but that she did not know whether M.M. was staying at the house on the night of the incident.

Finally, Lagunas testified in his defense. He had known M.M. for approximately five years; he knew M.M. from the camping trip and also claimed he saw her when she had frequently visited his wife when they were living at another home. He testified that, on July 23, 2000, he was living in the Cantus' house at 222 South Hackberry with his wife and children, that they had lived there for approximately four weeks, and that they kept possessions at the house, such as cassette tapes and clothing. Lagunas stated that he had his father-in-law's permission to be at the house. Even though the house was usually left unlocked at all hours, his wife kept a key, and he knew of a key located under the mat on the side door. He and his family used toiletry items at the house, used the showers, and helped clean up. Lagunas further claimed that, when stopped by the policeman and issued a ticket shortly after moving to South Hackberry, he gave the officer an older residence address because he could not remember the exact address of his new home.

Regarding the night in question, Lagunas testified that he went to his father's house and borrowed his truck to pick up his friend Gilbert to go play pool. Around 10:00 p.m., he went by the South Hackberry residence. He spoke with his wife, who told him she was going to San Antonio that night and that the children were with her niece. At this time, Lagunas claimed no one

11

else was there. He stayed only five minutes, and at 10:20 p.m. he went to Gilbert's house for approximately forty-five minutes. Lagunas then drove about a mile and a half back to his father's house and arrived there between 11:15 p.m. and 11:30 p.m. Because his mother was at the church retreat, Lagunas found only his father at home. After briefly speaking with his father, he went outside to smoke. Around midnight, Lagunas alleged that he drove three to four miles to the Texaco on Ruekle Road in order to buy more cigarettes, and, when he returned at 12:30 a.m., his mother was home. His mother bathed, and afterwards he and she talked until 1:00 a.m. when she went to bed. He watched television with his father for a bit and then went outside again to smoke. He heard a commotion and saw M.M. running toward him screaming, "Call 911," and appearing very upset. When she noticed Lagunas, she ran the other direction across the street. He said that he had no knowledge of any kidnapping involving M.M. Lagunas testified that he then wanted to leave New Braunfels because he had outstanding warrants for his arrest for child support payments, traffic tickets and a probation violation.[8] He claimed that, when the police came, they would question him and he would go to jail. When he returned to his parents' house the next morning, his mother told him that the police wanted to talk to him about M.M.'s kidnapping. Because he did not want to go to jail and had no money to post bond, he fled to Houston for two years so, as he put it, he could earn some money.

Lagunas also stated that it was impossible for him to have walked from his parents' house to the Cantus' house in only nineteen minutes due to his physical impairments: ankle screws

---

[8] Lagunas has also previously pleaded guilty to two DWI charges as well as theft by check.

12

from a previous foot injury, a knee injury, and residual back pain from a pinched nerve and pulled muscles.

Apolonio Cantu testified in rebuttal, stating that he and his wife lived at the house on 222 South Hackberry. At the time of the alleged kidnapping, M.M., her then-fiancé, and their children were living in the second bedroom. During this time, according to Mr. Cantu, Lagunas was not living at the South Hackberry house and had permission to enter only with his wife, Yolanda.

A jury convicted Lagunas of aggravated kidnapping and burglary of a habitation, and the district court sentenced him to thirty-five years' incarceration for burglary and twenty years' incarceration for aggravated kidnapping, sentences to run concurrently. This appeal followed.

## DISCUSSION

Lagunas presents two issues on appeal, challenging the admissibility of D.M.'s out-of-court statements to Officer Sullivan and the legal and factual sufficiency of the evidence supporting his convictions.

### Admission of D.M.'s out-of-court statements

D.M. did not testify at trial. Following *voir dire* of D.M., the district court refused to allow the then-seven-year-old to testify because "she hadn't answered enough questions to establish her ability to know the difference between the truth and what is not the truth at this point."[9] Instead, only her hearsay statements to Officer Sullivan were admitted, through his testimony.

---

[9] During the *in camera* hearing, the district court repeatedly asked D.M. whether she understood the difference between a truth and a lie. Her response each time: "I don't remember."

13

D.M.'s statements, along with the officers' accounts of the condition of M.M and the Cantu house following the incident, corroborated M.M.'s account of being taken from her house by Lagunas following a violent struggle. Lagunas, in contrast, denied any involvement and attempted to suggest that M.M. had staged the incident.

In his first issue, Lagunas presents two arguments challenging the district court's admission of Officer Sullivan's testimony regarding D.M.'s statements. First, he argues that D.M.'s statements do not qualify as "excited utterances" so as to be excepted from the hearsay rule. *See* Tex. R. Evid. 803(2). Second, he claims that the admission of those statements exclusively through Officer Sullivan violated his federal constitutional right of confrontation and cross-examination. *See* U.S. Const. amends. VI, XIV; *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400, 403-04 (1965).

### *Excited utterance*

We review the district court's admission of D.M.'s hearsay statements as excited utterances under the abuse of discretion standard. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). An abuse of discretion occurs "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id*. (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)).

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). For hearsay to be admissible, it must fit into an exception provided by a statute or the rules of evidence. Tex. R. Evid. 802. One such exception is that for excited utterances. Tex. R. Evid. 803(2). An

14

excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id*.; *Zuliani*, 97 S.W.3d at 595; *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). The basis for the excited utterance exception is a psychological one, namely, the fact that when someone is in "the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani*, 97 S.W.3d at 595 (quoting *Evans v. State*, 480 S.W.2d 387, 389 (Tex. Crim. App. 1972)). Underlying the exception is the belief that an excited utterance, unlike hearsay generally, tends to be trustworthy because it represents an event speaking through the person rather than the person speaking about the event. *Zuliani*, 97 S.W.3d at 595; *Ricondo v. State*, 475 S.W.2d 793, 796 (Tex. Crim. App. 1971).

In determining whether a hearsay statement is admissible as an excited utterance, the ultimate inquiry is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event or condition" when the statement was made. *Apolinar v. State*, 155 S.W.3d 184, 186-87 ( Tex. Crim. App. 2005) (citing *Zuliani*, 97 S.W.3d at 596). The court may consider factors such as "the length of time between the occurrence and the statement, the nature of the declarant, whether the statement was made in response to a question, and whether the statement is self-serving." *Id*. However, no single factor is dispositive, but merely bears on our ultimate determination. *Zuliani*, 97 S.W.3d at 596; *see also Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995); *Penry v. State*, 903 S.W.2d 715, 750-51 (Tex. Crim. App. 1995); *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992).

15

Officer Sullivan testified that, although R.M. appeared to be asleep when he entered the room, D.M. was only acting like she was asleep. She pulled the covers up her chest and closed her eyes. She appeared to be "forcing or squinting [her eyes] closed." She also "appeared terrified and she wanted to pretend like she was asleep." Officer Sullivan then identified himself and began talking to her. During this time, she began to cry. He asked her name and whether "everything was okay." At this point, she made the statements we have recited above.

D.M. was a four-year-old child at the time of the incident. Considering her behavior and the circumstances in which Officer Sullivan encountered D.M., we find that the district court did not abuse its discretion in finding it unlikely that D.M. had engaged in "reflective thought" that would have compromised the reliability of her statement. *See Zuliani*, 97 S.W.3d at 595. To the contrary, it is reasonable to conclude that D.M. acted in a manner consistent with a child "still dominated by the emotions, excitement, fear, or pain of the event or condition" when the statements were made. *Apolinar*, 155 S.W.3d at 186-87.

Lagunas argues that D.M.'s statements do not qualify because the exciting event—the entry of a strange man, Officer Sullivan, into the bedroom late at night—was not the same subject matter as her hearsay statements, which concerned her mother's alleged kidnapping several hours earlier. *See Graham v. State*, 486 S.W.2d 92, 94-95 (Tex. Crim. App. 1972). However, Officer Sullivan recounted that D.M. had appeared to be upset not only when he entered the room, but for some time afterward, as she continued to express fear and distress regarding the disappearance and, she believed, death of her mother. We conclude that the district court did not abuse its discretion

16

in concluding, based on Officer Sullivan's testimony, that D.M. had been "terrified" due to events other than Sullivan's entry into the bedroom, and thus admitting her statements as excited utterances.

### *Right of confrontation*

Next, Lagunas argues that the trial court's admission of D.M.'s statements violated his right of confrontation. *See* U.S. Const. amends. VI, XIV; *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400, 403-04 (1965).[10] In deciding the constitutional issue presented, we review the trial court's ruling *de novo*. *Davis v. State*, 2005 Tex. App. LEXIS 3773, at *9; *Muttoni v. State*, 25 S.W.3d 300, 304 (Tex. App.—Austin 2000, no pet.). The United States Supreme Court has held that the Sixth Amendment right of confrontation is applicable to the states

---

[10] Lagunas relied on *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), in his original brief, which predated *Crawford v. Washington*, 541 U.S. 36 (2004). Where, as here, a defendant has preserved a Confrontation Clause issue in a case pending on direct review at the time *Crawford* was decided, we are to apply *Crawford*. *See Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519, 2522-23 (2004); *see also Griffith v. Kentucky*, 479 U.S. 314, 320-28 (1987).

The State contends that Lagunas waived his Confrontation Clause claim at trial. *See* Tex. R. App. P. 33.1; *Bunton v. State*, 136 S.W.3d 355, 368-69 (Tex. App.—Austin 2004, pet. ref'd). Under the circumstances here, we find error was preserved.

Finally, we note that Lagunas had relied exclusively on the federal constitutional right of confrontation and makes no such claim under article I, section 10 of the Texas Constitution, nor any claim that our state constitution provides greater or different protection than the federal constitution. *See* Tex. R. App. P. 38.1(h); *see Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App. 1997); *Davis v. State*, No. 03-04-00014-CR, 2005 Tex. App. LEXIS 3773, at *1 n.1 (Tex. App.—Austin May 19, 2005, no pet.); *Hale v. State*, 139 S.W.3d 418, 421 (Tex. App.—Fort Worth 2004, no pet.). We will accordingly consider only the federal provision.

17

through the Due Process Clause of the Fourteenth Amendment. *Pointer*, 380 U.S. at 403; *Shelby v. State*, 819 S.W.2d 544, 546 (Tex. Crim. App. 1991).[11]

Before *Crawford*, hearsay statements were admissible against a defendant, notwithstanding the Confrontation Clause, if the statements bore sufficient "indicia of reliability." *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980). In fact, hearsay was deemed *per se* reliable if it fell within a "firmly rooted" exception to the hearsay rule, such as an excited utterance. *See White v. Illinois*, 502 U.S. 346, 355 n.8 (1992); *Guidry v. State*, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999). In *Crawford*, the Supreme Court abrogated *Roberts* and discarded its "adequate indicia of reliability" test insofar as it applied to "testimonial hearsay." *Crawford*, 541 U.S. 36, 61-65. Extensively reviewing the historical origins of the provision, the Court concluded that the Confrontation Clause's primary concern is "testimonial hearsay," that its ultimate goal is to ensure the reliability of evidence, and that it demands that such reliability be ascertained through a particular procedure: "by testing in the crucible of cross-examination." *Id*. at 53, 61. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 69.

The threshold question imposed by *Crawford*, then, is whether the proffered out-of-court statement is "testimonial" in nature. *Davis*, 2005 Tex. App. LEXIS 3773, at *12. The Confrontation Clause applies to those who "bear testimony"—"[a] solemn declaration or affirmation

---

[11] By virtue of the nature of our inquiry, we are guided and bound by the decision and reasoning of the United States Supreme Court. U.S. Const. art. VI, cl. 2; *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 427 (1819); *Guzman v. State*, 85 S.W.3d 242, 258 n.24 (Tex. Crim. App. 2002).

made for the purpose of establishing or proving some fact. *Crawford*, 541 U.S. at 51 (quoting Noah Webster, *An American Dictionary of the English Language* (1828)). The Supreme Court declined to spell out a comprehensive definition of "testimonial" but explained that it used the term in "its colloquial, rather than any technical legal sense." *Id*. at 53 n.4, 68. Testimonial statements certainly include testimony at preliminary hearings, before grand juries, and at former trials, as well as statements elicited during police interrogations. *Id*. at 51. The Court identified three kinds of statements that might also be regarded as testimonial: (1) "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 51.

The Court stressed that whether or not a statement was sworn is not a determinative factor in finding a statement to be testimonial. *Id*. at 52. Casual remarks to acquaintances are generally nontestimonial. *Id*. at 51. A statement is more likely to be testimonial if the person who heard, recorded, and produced the out-of-court statement at trial is a government officer. *Id*. at 52-53. If the person obtaining the statement is a governmental employee or police officer carrying out an investigation or prosecutional functions, the statement is "testimonial." *Id*. at 52-53.

A central holding of *Crawford* is that the Confrontation Clause is a rule of procedure, not of evidence. "If there is one theme that emerges from *Crawford*, it is that the Confrontation

19

Clause confers a powerful and fundamental right that is no longer subsumed by the evidentiary rules governing the admissibility of hearsay statements." *United States v. Cromer*, 389 F.3d 662, 679 (6th Cir. 2004). The constitutional requirement that a testimonial statement be subject to cross-examination in criminal cases "does not evaporate when testimony happens to fall within some broad modern hearsay exception, even if the exception is sufficient in other circumstances." *Crawford*, 541 U.S. at 56 n.7. In this respect, it is irrelevant that a testimonial statement may meet the excited utterance exception test. *See Davis*, 2005 Tex. App. LEXIS 3773, at *18 (citing *Lopez v. State*, 888 So. 2d 693, 697 (Fla. App. 1st Dist. 2004)). Mere reliability is not enough to satisfy the Confrontation Clause where the extrajudicial statements are of a testimonial nature. *Id.* (citing *United States v. Gonzalez-Marichal*, 317 F. Supp. 2d 1200 (S. D. Calif. 2004)). "Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices." *Crawford*, 541 U.S. at 51. Thus, under *Crawford*, the Confrontation Clause analysis will usually turn on the question of whether a particular statement is testimonial or nontestimonial in nature. *See Davis*, 2005 Tex. App. LEXIS 3773, at *19. On the other hand, the *Roberts* line of cases may remain instructive or controlling with regard to nontestimonial hearsay. *See id.*

State and lower federal courts continue to struggle to delineate the parameters of "testimonial" statements under *Crawford*, especially the nature of "[s]tatements taken by police officers in the course of interrogations" and other "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52. In *Davis*, we considered *Crawford*'s application

where police had responded to a 911 call, heard a woman screaming hysterically, and an officer had followed her out of the house and spoken with her concerning the incident. *Davis*, 2005 Tex. App. LEXIS 3773, at *3-4. The woman recounted in detail how the defendant had severely beaten and choked her until police arrived. *Id*. at *5. The woman later refused to testify at trial, but the officer was permitted to testify, over objection, concerning her statements to him. *Id*. at *4-5. The statements at issue, like D.M's here, were admitted at trial as excited utterances.

We surveyed extensively the Texas decisions to date regarding the nature of testimonial statements. *See id*. at *20-27. We acknowledged that a number of other courts had suggested that excited utterances could not be testimonial because their distinguishing character as spontaneous outbursts made under emotional distress, without deliberation or premeditation, bore little resemblance to *Crawford*'s conception of statements elicited through formal, structured, police interrogation. *See id*.[12] However, we rejected a categorical rule that evidence admissible as an excited utterance is "*ipso facto* nontestimonial hearsay outside the scope of the Confrontation Clause and admissible into evidence." *Id*. at *28-29. Rather, "[e]ach case must be examined on its facts to determine if the evidence is testimonial and controlled by *Crawford*." *Id*. at *29; *see also Scott v. State*, 165 S.W.3d 27, 46-47 (Tex. App.—Austin 2005, pet. filed) (whether statement is

---

[12] *See Key v. State*, No. 12-04-00030-CR, 2005 Tex. App. LEXIS 1573, at *4-5 (Tex. App.—Tyler, Feb. 25, 2005, no pet.); *see also Hammon v. State*, 809 N.E.2d 945, 952-53 (Ind. Ct. App. 2004); *Fowler v. State*, 809 N.E.2d 960, 964 (Ind. Ct. App. 2004), *transfer granted*, 2004 Ind. LEXIS 1030 (Ind. Dec. 9, 2004).

testimonial does not turn on whether it qualifies as self-inculpatory within meaning of hearsay exception).[13]

We then proceeded to identify a number of issues we considered the officer's testimony to raise under *Crawford* and prior Texas decisions:

> Officers Cortez and Canizales responded to a 911 call. ***When they arrived at the scene, they could easily be characterized as "responding officers." How long did that label apply?*** The officers found appellant and Ford in a house from which they heard screams. Ford left the house at Cortez's instructions. As she did, she stated to the officers: "[H]e tried to kill me," ***a form of accusation and yet a plea for assistance***. Appellant was taken into custody. It was determined the other man in the house had nothing to do with the assault. Ford had reached the porch of a neighbor's house across the street. The scene was apparently secured. Officer Cortez related that Officer Canizales went across the street to get Ford's "side of the story." Canizales testified that his purpose in "interviewing" Ford was to determine what happened and who committed the assault. He further stated that the "story he got from her was the result of questioning." At one point, however, he stated that he simply asked what happened and she told him. ***Had Canizales at this point become an investigating officer at the scene?*** From the record, we know that at this time Canizales took photographs of Ford which were introduced into evidence. Canizales also made an offense report, as he was trained and required to make, that was used at trial to refresh his memory as to the details of what Ford told him. Frequent references during trial were made to page six of the offense report. Other employees of the police department were summoned to the scene as well as an ambulance—steps normally taken under similar circumstances, not only to assist the complainant but with an eye to potential prosecution.
>
> The oral statements made by Ford to the uniformed Officer Canizales identified appellant and then, in a series of accusations against appellant, detailed blow by blow the assault made upon her. ***Surely, a reasonable 51-year-old declarant like Ford would have known that her accusations made to a uniformed police officer would be passed on to prosecutorial authorities to be used against appellant. Ford's statements may serve either or both of two primary objectives—to gain immediate***

---

[13] The Texarkana Court of Appeals has since agreed with our *Davis* approach of analyzing the testimonial nature of a statement independently of its admissibility under the rules of evidence. *See Moore v. State*, 2005 Tex. App. LEXIS 5777, at *17-18 (Tex. App.—Texarkana July 26, 2005, no pet. h.).

*official assistance in terminating an exigent situation and to provide information to aid investigation and possible prosecution arising from the situation*. Merely because a declarant is excited, the statements made do not lose their character as testimonial statements subject to the Confrontation Clause.

*Id.* at *29-31 (emphasis added). Although we ultimately resolved the Confrontation Clause issue on harmless error grounds, *see id*. at *31-35, the considerations we identified when pondering *Crawford*'s application are instructive here:

- Whether the statement was spontaneous (*e.g.*, a "plea for assistance") or elicited by others. A number of Texas courts have relied on similar considerations when addressing *Crawford*.[14] Implicit in this consideration is a recognition that, while excited utterances might not categorically be non-testimonial, the characteristic of spontaneity or lack of deliberation that establishes a particular statement is an excited utterance might nonetheless be a factor in whether it is testimonial.[15]

---

[14] *See Spencer v. State*, 162 S.W.3d 877, 883 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (witness initiated contact); *Wilson v. State*, 151 S.W.3d 694, 697-98 (Tex. App.—Fort Worth 2004, pet. filed) (finding that admission of non-testifying witness's self-initiated statements to police officers in response to unstructured questions during the investigation of a crime did not violate *Crawford*); *Davis v. State*, No. 2-03-305-CR, 2005 Tex. App. LEXIS 712, at *4 (Tex. App.—Fort Worth Jan. 27, 2005, no pet. h.) (not designated for publication) (holding that voluntary statements to police initiated by witness are not interrogation and therefore are nontestimonial); *see also State v. Forrest*, 596 S.E.2d 22, 24-25, 27 (N.C. Ct. App. 2004) (kidnapping victim's spontaneous statements to police immediately after being rescued not testimonial).

[15] To this extent, although the analyses are conceptually distinct, some of the same underlying facts and circumstances may bear upon the determination of both whether a hearsay statement is an excited utterance and whether it is testimonial under *Crawford*. The State proposes that, in cases where the status of a hearsay statement as an excited utterance and *Crawford* testimonial hearsay are both disputed, we adopt an analytical framework in which we consider, first, whether the statement is an excited utterance; and, if so, then whether it is testimonial. We agree that this is a useful framework—and one consistent with *Davis*—and apply it here.

23

- To whom the statement was made (*e.g.*, "to a uniformed police officer" versus a friend or acquaintance).[16]

- The age or sophistication of the declarant (*e.g.*, "a reasonable 51-year-old declarant like Ford would have known that her accusations made to a uniformed police officer would be passed on to prosecutorial authorities to be used against appellant").[17]

- The nature of any involvement by law enforcement (*e.g.*, was the statement made during police interrogation or investigation, or were the police attempting to respond to and gain control of a situation.).[18]

- Related to the previous consideration, the temporal proximity of the statement to any emergency or exigent situation.[19]

---

[16] *See Flores v. State*, 2005 Tex. App. LEXIS 5190, at *5-6 (Tex. App.—Amarillo July 6, 2005, no pet. h.) (holding that hearsay statement between relatives concerning the circumstances of an infant's death was not testimonial); *Lee v. State*, 143 S.W.3d 565, 568-71 (Tex. App.—Dallas 2004, pet. filed) (nontestifying co-defendant's out-of-court statements to police officers at scene of automobile stop testimonial); *see also Lopez v. State*, 888 So. 2d 693, 697, 699 (Fla. Ct. App. 2004) (statement to responding officer testimonial even though it was excited utterance); *People v. Vigil*, 104 P.3d 258, 265 (Colo. Ct. App. 2004) (excited utterance child made to his father immediately after sexual assault not testimonial); *Demons v. State*, 595 S.E.2d 76, 80 (Ga. 2004) (excited utterance made to friend not testimonial); *State v. Manuel*, 685 N.W.2d 525, 532 (Wis. Ct. App. 2004) (statement declarant made to his girlfriend not testimonial); *but see People v. Vigil*, 104 P.3d 258, 262-63 (Colo. Ct. App. 2004) (child's videotaped statement to officer, although in relaxed setting, testimonial); *Moody v. State*, 594 S.E.2d 350, 353-54 (Ga. 2004) (victim's statement to investigating officer at scene shortly after event testimonial); *People v. Victors*, 819 N.E.2d 311, 320-21 (Ill. App. Ct. 2004) (victim's statements to police officer at scene testimonial); *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (statement by defendant's girlfriend to officer during execution of search warrant testimonial).

[17] *Davis*, 2005 Tex. App. LEXIS 3773, at *30-31.

[18] *See Spencer*, 162 S.W.3d at 883 (preliminary questions when police arrive to assess and secure crime scene do not constitute interrogation); *see also People v. Corella*, 18 Cal. Rptr. 3d 770, 776 (Cal. Ct. App. 2004) (statements not "knowingly given in response to structured police questioning," thus bearing no indicia common to official and formal quality of various statements deemed testimonial by *Crawford*); *see also supra* note 16.

[19] *See Samarron v. State*, 150 S.W.3d 701, 706-07 (Tex. App.—San Antonio 2004, pet. ref'd) (witness agreed to go to station, not interviewed at scene; statement testimonial).

Subsequent to *Davis*, the Amarillo Court of Appeals identified a similar set of guideposts for determining whether a statement is testimonial: (1) to whom the statement was made, (2) was it volunteered or solicited, (3) was it uttered during casual conversation, a formal legal proceeding or an investigation, and (4) when it was made. *Flores v. State*, ___ S.W.3d ___, 2005 Tex. App. LEXIS 5190, at *5-6 (Tex. App.—Amarillo July 6, 2005, no pet. h.). Moreover, as the *Flores* court alludes, a number of Texas courts have equated *Crawford*'s "police interrogation" with formal, structured questioning, suggesting that statements responding to casual conversation or preliminary questioning by law enforcement would not be testimonial.[20] We emphasize that these considerations are not evidentiary in nature, but merely factors that may be useful in characterizing whether a particular statement is testimonial or non-testimonial. Once a statement is determined to be testimonial, courts must adhere to the procedural guarantees of the Confrontation Clause.

The foregoing considerations are not necessarily exclusive, and we recognize here, as we did in *Davis*, that some of them may provide ambiguous guidance in some circumstances. *See Davis*, 2005 Tex. App. LEXIS 3773, at *26-27 (discussing *Lopez v. State*, 888 So. 2d 693, 697, 699 (Fla. Ct. App. 2004)), *30 (noting the dual roles of police offense reports). Nonetheless, they provide at least a starting point in our ultimate determination of whether D.M.'s statement was one "taken by police officers in the course of interrogations" and "made under circumstances which

---

[20] *See Flores v. State*, 2005 Tex. App. LEXIS 5190, at *5-6; *see also Ruth v. State*, No. 14-03-01158-CR, 2005 Tex. App. LEXIS 4729, at *17-18 (Tex. App.—Houston [14th Dist.] June 21, 2005, no pet.) (involving comments made during 911 call); *Spencer*, 162 S.W.3d at 879-81 (preliminary questions at scene after 911 call); *Gonzalez v. State*, 155 S.W.3d 603, 610 n.4 (Tex. App.—San Antonio 2004, pet. dism'd); *Wilson v. State*, 151 S.W.3d 694, 698 (Tex. App.—Fort Worth 2004, pet. ref'd) (witness approached officers at scene).

would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52. We also acknowledge that subsequent developments in this rapidly evolving area of the law may shed additional light on the issues we are attempting to address here; as such, we are attempting to hit a "moving target."

We begin with the age and sophistication of D.M. D.M. was four years old at the time of her statement to Officer Sullivan. Courts around the nation have struggled with the application of *Crawford* to child witnesses, particularly how courts should apply the concept of "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *see Crawford*, 541 U.S. at 52, or whether the proper test should be objective or subjective in nature.[21] We need not decide now whether, as a general rule, statements by children are inherently non-testimonial or whether D.M.'s age alone renders her

---

[21] *See, e.g., T.P. v. State*, CR-03-0574, 2004 Ala. Crim. App. LEXIS 236, at \*12-13 (Ala. Crim. App. 2004) (statements result of interview conducted by social worker and investigator, as part of criminal investigation, testimonial); *People v. Warner*, 14 Cal. Rptr. 3d 419, 429 (2004) *review granted on other grounds*, 97 P.3d 811 (2004) (statement of minor to multi-disciplinary interview center specialist and observed by police investigator was "testimonial" because it was intended to be used, at least in part, as investigative tool for criminal prosecution); *People*, 104 P.3d at 265 (excited utterances made by child to his father and father's friend were not testimonial because they were not solemn or formal statements and were not made to persons associated with governmental activity); *State v. Grace*, 111 P.3d 28, 38 (Haw. Ct. App. 2005) (police officer testimony of her interview of two girls, aged ten and eleven, constituted "testimonial" evidence because "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"); *Snowden v. State*, 846 A.2d 36, 47 (Md. Ct. Spec. App. 2004) (statements of minors to social worker were "testimonial" because they were made for purpose of developing their testimony for trial); *People v. Geno*, 683 N.W.2d 687, 692 (Mich. Ct. App. 2004) (statement made by child was not "testimonial" because it was made to nongovernment employee and was not statement in nature of "'*ex parte* in-court testimony or its functional equivalent'"); *see generally* Robert P. Mosteller, Crawford v. Washington*: Encouraging and Ensuring the Confrontation of Witnesses*, 39 U. Rich. L. Rev. 511, 538 (2005).

26

statements non-testimonial.[22] We decide only that D.M.'s age and her emotional state are factors strongly suggesting that her statements to Officer Sullivan were non-testimonial. Considering the context, D.M.'s statements amounted to a small child's expressions of fear arising from her mother's absence. D.M.'s reaction was of one seeking comfort and information concerning her mother, a reaction to be expected from a frightened child approached by a police officer under such circumstances in the middle of the night.

As for law enforcement involvement, we note that Officer Sullivan entered the Cantu house and M.M.'s bedroom to check on the safety of M.M.'s children at her request after she appeared in unusual circumstances on Schmidt Avenue, some distance from home. Officer Sullivan recounted that his primary concern had been to discern whether "everything was ok." When he located D.M. and her brother in bed, he asked her name and told her that he was a police officer. He then noticed that she was "terrified" and crying. He asked her if everything was "okay." He reported that D.M. responded that it wasn't and added, "Her mommy was dead." At this point, Officer Sullivan asked D.M. what happened to her mother. She responded, "A bad man had killed her and took her away" and grew more upset. Officer Sullivan then informed D.M. that her mother was with other police officers, and the child calmed. Once other officers arrived, Officer Sullivan began to investigate the scene. He did not question D.M. further.

The statements Officer Sullivan elicited lent key support to M.M.'s disputed account that, in fact, she had been beaten and violently kidnapped. *See* Tex. Pen. Code Ann. § 20.04(a)(4)

---

[22] We also do not decide if we evaluate her statements from an objective or subjective point of view. In either case, we find here that the statements were non-testimonial.

(aggravated kidnapping). However, Officer Sullivan's exchange with D.M. was unlike the sort of formalized or structured interrogation that has been held to give rise to testimonial hearsay. To the contrary, it was closer in nature to a preliminary question in which Officer Sullivan sought to clarify D.M.'s spontaneous statement that her mother was dead. There was not time to formulate careful, structured questioning. Instead, Officer Sullivan's questions were consistent with the behavior of a reasonable adult seeking (in some ways successfully, in some ways not) to calm a frightened child in the middle of the night. Significantly, after calming D.M., Officer Sullivan asked her no further questions regarding the circumstances of her mother's disappearance.

Under *Crawford*, excited utterances, admissible as hearsay exceptions, may be testimonial and thus inadmissable absent an opportunity to cross-examine. *See Davis*, 2005 Tex. App. LEXIS 3773, at *18. In this case, Officer Sullivan elicited some of D.M.'s statements, a factor that might otherwise weigh toward a finding that they were testimonial. However, we conclude that the child's statements, when viewed in light of her age and state of mind, together with the circumstances surrounding her interaction with Officer Sullivan, lack the indicia of solemn declarations made to establish or prove a fact. *See Crawford*, 541 U.S. at 51-52.[23] D.M.'s statements were not testimonial in nature as envisioned by the Confrontation Clause and *Crawford*. Thus, we hold that the admission of D.M.'s statements through Officer Sullivan's testimony did not violate Lagunas's right of confrontation.

---

[23] *See supra* note 20.

*Conclusion concerning D.M.'s statements*

Because we have concluded that the trial court did not abuse its discretion in admitting D.M.'s hearsay statements as excited utterances and that D.M.'s statements were not testimonial, we overrule Lagunas's first issue.

**Sufficiency of the evidence**

In his second issue, Lagunas challenges the legal sufficiency of the evidence supporting his convictions for burglary and aggravated kidnapping. He also challenges the factual sufficiency of the evidence establishing his identity as the person who committed the offenses. We will first consider his legal sufficiency arguments and then turn to his factual insufficiency claim. *See Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996).

*Legal sufficiency*

Lagunas brings two legal sufficiency challenges. First, he argues that the evidence is legally insufficient to support a conviction for burglary of a habitation because the record does not contain evidence that Lagunas lacked consent to enter the house. *See* Tex. Pen. Code Ann. § 30.02(a) (West 2003). Second, he asserts that testimony that a "sharp pointy object" was used during the alleged events is legally insufficient to support a conviction for aggravated kidnapping. *See id*. § 20.04(a)(4). We will address each in turn.

*Standard of review*

When determining whether evidence is legally sufficient to support a conviction, we must view the evidence in the light most favorable to the verdict and determine whether any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Curry v. State,* 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *Johnson v. State*, 23 S.W.3d 1, 15 (Tex. Crim. App. 2000). We do not examine the fact-finder's weighing of the evidence but merely determine whether there is more than a "mere modicum" of evidence supporting the judgment. *Clewis*, 922 S.W.2d at 132 n.10; *Coggin v. State*, 123 S.W.3d 82, 89 (Tex. App.—Austin 2003, pet. denied); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988).

*Burglary*

First, Lagunas challenges the legal sufficiency of his conviction for burglary, claiming that the State did not prove that he entered the Cantus' house without effective consent of the owners. *See* Tex. Pen. Code Ann. § 30.02(a); *McDuff v. State*, 939 S.W.2d 607, 623 (Tex. Crim. App. 1997) (State has burden to prove each element beyond reasonable doubt). A person commits burglary when he, without the effective consent of the owner, enters a building or habitation and commits or attempts to commit a felony, theft, or an assault. *See* Tex. Pen. Code Ann. § 30.02(a). Ownership is not restricted to those persons having title interest in property, but can include those in possession. *Ex Parte Davis*, 542 S.W.2d 192, 195 (Tex. Crim. App. 1976); *see also* Tex. Pen. Code Ann. § 1.07(a)(24) (West 2003). "Possession" is "actual care, custody, control or management." *See* Tex. Pen. Code Ann. § 1.07(39) (West 2003).

In his argument, Lagunas relies on evidence that he and his wife had permission from the Cantus, his wife's parents, to live in the house. However, in this case, both Apolonio Cantu and M.M. testified that Lagunas did not have permission to enter the South Hackberry premises without

his wife. Although evidence exists to the contrary, our standard of review dictates that we review the evidence in the light most favorable to the verdict and determine whether a rational juror could have decided accordingly. *See Jackson*, 443 U.S. at 319; *Curry*, 30 S.W.3d at 406; *Johnson*, 23 S.W.3d at 15. In reviewing the record, we find sufficient evidence to support the inference that Lagunas did not have permission to enter the house without his wife and that, therefore, he lacked the effective consent of the Cantus to enter the house. *See* Tex. Pen. Code Ann. § 30.02(a).

### Aggravated kidnapping

In his second legal sufficiency claim, Lagunas challenges his conviction for kidnapping, stating the State failed to prove the deadly-weapon element of aggravated kidnapping beyond a reasonable doubt. *See id*. § 20.04(b) (West 2003). However, Lagunas was not charged under the deadly-weapon section of the aggravated kidnapping statute. *See id*. Rather, the State alleged that Lagunas "intentionally or knowingly abduct[ed] another person with the intent to inflict bodily injury," a different subsection of the statute. *See id*. § 20.04(a)(4).

The "deadly weapon" to which Lagunas alludes did not appear in the indictment, the jury charge, or the judgment. Consistent with the indictment, he was convicted only of intentionally or knowingly abducting another person with intent to inflict bodily injury. *See id*. § 20.04(a)(4). We accordingly reject Lagunas's argument.

### Factual sufficiency

Finally, Lagunas asserts that the evidence is factually insufficient to establish his identity as the person who committed the alleged burglary and kidnapping. In a factual sufficiency

review, we view all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *See Zuniga v. State*, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004). We review the fact-finder's weighing of the evidence and may disagree with the fact-finder's determination. *Clewis*, 922 S.W.2d at 133. But a factual sufficiency analysis can consider credibility only on those few matters bearing on credibility that can be fully determined from the appellate record. *See Johnson*, 23 S.W.3d at 8. A factual sufficiency review must employ appropriate deference to the fact-finder's role as the sole judge of the weight and credibility to be given to witness testimony. *Id*. at 7.[24]

In this case, M.M. testified she had known Lagunas for about three years. She added that she had recognized his voice when he was assaulting her, and that she saw him and knew who he was before he took her from the house. She also had identified the clothing he was wearing, and she later was able to see him through a hole in the bag he had placed over her head. In addition, M.M. had placed Lagunas at his parents' house around the time she had called the police, a point on which both Lagunas and mother agreed. Although Officer Peltier did not record in the incident report that M.M. had been able to contemporaneously identify Lagunas, he testified that she had

---

[24] Lagunas argues that we should apply a "totality of the circumstances" standard when reviewing his claims concerning the sufficiency of the evidence of identification. *See Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998); *see also Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). *Biggers* and *Loserth* concerned in-court identifications where it was alleged that pretrial identification procedures were impermissibly suggestive, in violation of the defendants' due process rights under the Fourteenth Amendment. *See Biggers*, 409 U.S. at 194-99; *Loserth v. State*, 963 S.W.2d at 771-72. Lagunas makes no such claim here. We will therefore review his claim under our usual factual sufficiency standards.

32

made that identification. As well, she told Officer Gabbard that she had seen her attacker and that it was Lagunas. She was later able to pick him out of a photographic line-up.

The jury was presented with all the evidence concerning the identity of M.M.'s alleged attacker and was able to weigh the credibility of the witnesses. Viewing this evidence in a neutral light, it is not so weak to render the verdict clearly wrong and manifestly unjust, nor is the contrary evidence so strong that the standard of proof beyond a reasonable doubt could not have been met. *See Zuniga*, 144 S.W.3d at 484-85. We reject Lagunas's factual sufficiency challenge.

### *Conclusion concerning the sufficiency of the evidence*

Having rejected Lagunas's three challenges to the sufficiency of the evidence, we overrule his second issue.

### CONCLUSION

We have overruled Lagunas's issues on appeal. We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed:  August 26, 2005

Publish

33