Duane Cortez WILSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–04–00594–CR.

Court of Appeals of Texas,
San Antonio.

Feb. 1, 2006.

Phyllis J. Beal, San Antonio, for appellant.

Mary Beth Welsh, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, REBECCA SIMMONS, Justice.

## OPINION

Opinion by REBECCA SIMMONS, Justice.

Appellant Duane Wilson was charged with the December 26, 2002 murder of Trishawn Fifer. A jury convicted Wilson and sentenced him to thirty years in the Institutional Division of the Texas Department of Criminal Justice. The evidence at trial consisted primarily of statements made by the victim's four year old daughter, Wilson's inconsistent statements, witness accounts of activity at the victim's residence and Wilson's cellular phone records. Wilson raises five issues on appeal, claiming the trial court erred in: (1) denying his motion for continuance; (2) denying his *Jackson v. Denno* motion; (3) admitting evidence provided by Crystal Danko, a cellular phone company employee; (4) admitting hearsay statements of Jolie Fifer; and (5) finding the evidence legally and factually sufficient to support his conviction. Because we are unable to conclude that the trial court erred in any of the challenged actions, we affirm the trial court.

## Factual Background

On December 26, 2002, at approximately 5:30 a.m., neighbor Theresa Zapata saw the victim's husband, Nathaniel Fifer, waiting at the bus stop just like every other morning. Later that morning, between 7:35 and 7:40 a.m., Zapata noticed a gray Montero Sport parked in Fifer's driveway. This was unusual because neither Nathaniel nor his wife Trishawn, both of whom were profoundly deaf, drove a vehicle. Zapata further explained that although she had seen different people help the Fifers with transportation needs, she had never seen this particular vehicle at the residence.

Lisa Rodriguez, another neighbor, was driving to work shortly after 8:00 a.m. when she noticed a toddler running around outside, without a jacket and without supervision. Out of concern, she followed the little girl into a house where she was met by an older child and led into the master bedroom. Rodriguez, a medical assistant, testified that she found pregnant Trishawn Fifer, unconscious and laying on the ground. Although she saw no visible injuries, Rodriguez was unable to obtain a pulse or confirm any signs of breathing. Trishawn's hair and shirt were wet, but there were no signs of blood or trauma and nothing in the bedroom or residence appeared to be out of place. The older child continuously beat her fist against her chest and saying "mama boom." EMS confirmed Trishawn's death and Nathaniel was notified at his place of employment.

Upon Nathaniel's arrival, San Antonio Police Department Officer Daniel Anders, called to the scene to assist in sign language interpretation, accompanied Nathaniel to the neighbor's house where the children were staying. Anders watched as the little girls approached Nathaniel and started to cry. The older child, identified as four year old Jolie, was very upset and began telling her father, in both sign language and verbally, "Mommy, Mommy's crying." Anders noted Jolie repeated "Mommy cry, stepfather choke, cry, floor, green, and then truck." Because of Nathaniel's intense reaction to Jolie's utterance, Anders inquired about a specific sign Jolie had used wherein she placed her thumb to her forehead. Nathaniel explained it was a shorted version of "stepfather."

They returned to the Fifer residence and Officer Anders assisted Nathaniel in contacting relatives. One of the numbers provided was answered by Wilson, Trishawn's stepfather, who had recently separated from her mother. Anders requested Wilson come to the residence, but did not provide any additional information. Shortly after Wilson's arrival, Anders was carrying Jolie outside of the neighbor's residence when she spontaneously pointed toward Wilson and said "scary, scary, bad man. Mommy's crying." Anders testified that Jolie was visibly scared of Wilson.

By the time the Bexar County crime lab personnel arrived at the residence, there were visible marks on Trishawn's neck and the case was classified as a homicide. The officers at the scene requested witness statements from several people, including Trishawn's sisters, neighbors, Nathaniel and Wilson. In response, Wilson voluntarily drove himself to the police station to provide a statement.

During trial, Wilson's purported alibi was rebutted by several witnesses. The Sprint records for Wilson's cellular phone established the specific cellular towers reached by Wilson's cellular phone on the day of the murder. Sprint employee Crystal Danko testified, over Wilson's objection, that the cellular phone records showed Wilson traveling from the vicinity of his residence to the vicinity of the victim's residence during the time period in

question. Wilson was ultimately charged and stood trial for the murder of Trishawn Fifer and was ultimately convicted by a jury and sentenced to thirty years in the Institutional Division of the Texas Department of Criminal Justice.

## MOTION FOR CONTINUANCE

Shortly before trial, Wilson's trial counsel filed a motion for continuance claiming, among other things, that his trial schedule precluded him from being ready for trial, all of his pretrial motions had not yet been heard and the State had failed to provide him a complete list of witnesses. The motion for continuance was granted in part and denied in part. Wilson claims that the trial court erred in denying his motion for continuance because his trial counsel's scheduling conflict prevented counsel from adequately preparing Wilson's case. Additionally, Wilson argues that the continuance should have been granted because the State designated new experts, shortly before trial, denying trial counsel the opportunity to investigate the experts. Furthermore, the State failed to provide a complete witness list and the trial court failed to rule on his motion filed in accordance with *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (holding that a defendant not only has a right to be examined by an expert, but also has the right to have an expert appointed to assist him in his defense). Wilson argues that the trial court should have granted a continuance in order to hold an ex parte *Ake* hearing to determine whether Wilson had the right to have an expert appointed to assist in his defense.

## STANDARD OF REVIEW

■ A motion for continuance is a matter left to the sound discretion of the trial court. TEX.CODE CRIM. PROC. ANN. art. 29.06 (Vernon 1989) (sufficiency of a motion for continuance shall be addressed to "sound discretion" of court and "shall not be granted as matter of right"). As such, we apply an abuse of discretion standard of review to the trial court's ruling. *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim.App.1996) (citing *Heiselbetz v. State*, 906 S.W.2d 500 (Tex.Crim.App.1995)). To prevail, the defendant must show that he was prejudiced by his counsel's inadequate time for preparation and necessary investigation. *Duhamel v. State*, 717 S.W.2d 80, 83 (Tex.Crim.App.1986).

## ANALYSIS

■ First and foremost, contrary to Wilson's argument that the trial court failed to conduct an *Ake* hearing, on June 15, 2004, the trial court held an ex parte hearing wherein defense counsel urged his motion for a three week continuance. The trial court granted the motion in part and denied the motion in part. The trial court further declared Wilson indigent with regard to his *Ake* motion and appointed the experts identified by trial counsel's primary affidavit, but not in a secondary affidavit.[1]

On the motion for continuance, the trial court granted a partial continuance of the jury selection scheduled for Wednesday, June 16, 2004 to Tuesday, June 22, 2004. Additionally, the trial court ordered a trial continuance from Friday, June 25, 2004 until 1:30 p.m. on Tuesday, June 29, 2004, in essence providing counsel with addition-

---

1. Without going into the details of the sealed hearing, the trial court approved the requested experts that were sufficiently identified by defense counsel and invited counsel to re-urge his requests upon obtaining locations and/or identifications of any additional experts necessary to his defense.

al time prior to his presentation of witnesses.

Although Wilson claims the denial of the continuance rendered his counsel unprepared to present an adequate defense, he does not allege any specific prejudice to his defense such as surprise or inability to effectively cross-examine the State's witnesses. *See Vasquez v. State,* 67 S.W.3d 229, 240 (Tex.Crim.App.2002). To the contrary, Wilson's trial counsel appeared knowledgeable regarding the facts of the case and about each of the witnesses called to testify. His counsel conducted *extensive,* very fact specific, cross-examinations and presented several witnesses in his case-in-chief. The bare assertion that counsel did not have adequate time to prepare for trial is not proof of prejudice. *Cooks v. State,* 844 S.W.2d 697, 725 (Tex. Crim.App.1992).

A review of the docket shows defense counsel had ample time to examine and investigate all of the evidence and statements upon which the State relied. *Duhamel,* 717 S.W.2d at 83 (holding that claim of counsel's inadequate time to investigate, without any showing of harm, failed to establish an abuse of discretion). The alleged murder occurred on December 26, 2002. A true bill of indictment was returned by the grand jury on April 16, 2003 and trial counsel filed his first discovery motion on May 8, 2003. The case was originally set on June 2, 2003 and reset several times, many times at the request of the defense. The case had been set for trial for almost two months without any new revelations in the evidence. Moreover, the reports and statements provided by material witnesses were the same reports and statements provided to defense counsel almost a year prior to the case being called for trial. No evidence was presented that Wilson's counsel suffered

harm by the court's refusal to grant the continuance.

In light of the action taken by the trial court and the lack of prejudice shown by Wilson, we cannot conclude that the trial court abused its discretion in denying Wilson's motion for continuance. We therefore overrule Wilson's fifth point of error.

ADMISSIBILITY OF WILSON'S STATEMENTS

Evidence supporting Wilson's conviction included his inconsistent statements, both oral and written, made while he was at the police station. Wilson claims the trial court erred in denying his motion to suppress these statements because they were obtained in violation of *Jackson v. Denno.* 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (holding that trial judge's determination of the admissibility of a confession is based on whether the confession was voluntarily given).

 The trial court's ruling on a motion to suppress is subject to review for abuse of discretion. *Balentine v. State,* 71 S.W.3d 763, 768 (Tex.Crim.App.2002). During a motion to suppress evidence, the trial judge is the exclusive trier of fact and the sole judge of the credibility of witnesses, including the weight to be given to their testimony. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App.1996); *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim.App.1990); *see also State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim.App.2000) (holding total deference is given to the trial court's determination of historical facts supported by the record, especially when the trial court's findings turn on evaluating a witness's credibility and demeanor).

Because an officer's obligation to administer Miranda warnings, like those of article 38.22, section 6 of the Texas Code of Criminal Procedure, only arises when a person is "in custody," we must first con-

sider whether Wilson was subjected to custodial interrogation. *See Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Parra v. State,* 743 S.W.2d 281, 285 (Tex.App.-San Antonio 1987, pet. ref'd). The Texas Court of Criminal Appeals has outlined four general situations which may constitute custody: (1) when a law enforcement officer physically deprives the suspect of his freedom of action in a significant way; (2) when a law enforcement officer informs the suspect he cannot leave; (3) when there is probable cause to arrest and law enforcement officers fail to inform the suspect he is free to leave; and (4) when a law enforcement officer creates a situation that leads a reasonable person to believe his freedom of movement has been significantly restricted. *Dowthitt v. State,* 931 S.W.2d 244, 255 (Tex.Crim.App.1996).

 In the first three situations, the restraint on freedom must stem from an arrest, not just an investigative detention. *Id.* The latter situation requires a showing that a reasonable person would not believe they were free to leave. *Id.* An appellate court views the evidence and all reasonable inferences drawn in the light most favorable to the trial court's ruling. *Villarreal,* 935 S.W.2d at 138. Further, the review is limited to whether the trial court correctly applied the law to the facts. *Romero,* 800 S.W.2d at 543.

### ANALYSIS

 In accordance with *Jackson v. Denno,* 378 U.S. 368, 380, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the trial court conducted a pretrial hearing to determine the voluntariness of Wilson's statements. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22 (Vernon 1979 & Supp.2004–05); *see also Lopez v. State,* 384 S.W.2d 345, 348 (Tex.Crim. App.1964).

The record supports that on December 26, 2002, the day of the murder, Wilson drove himself to the police station to provide a statement in response to a request by officers at the scene. Of note, when Detective Lindley escorted Wilson to an interview room, the officers did not know how, or even if, Trishawn had been murdered. Wilson was never hand-cuffed, nor was his freedom of movement hindered in any way. Wilson was told that he was not under arrest and was free to leave at any time. Although Wilson argues that his requests to leave were not honored, the record supports that each time Wilson mentioned leaving, the officers again assured him that he was free to leave. Although Appellant expressed a readiness to leave, he was unwavering in his willingness to continue answering any and all questions posed by the officers. Appellant's desire to tell his version of the events in question was also evidenced by the hand written changes made after his statement was typed and after his comments to the officers regarding leaving. Moreover, the record does not support Wilson was, at any point, precluded from leaving the station.

Additionally, Wilson did not appear to be under the influence of any narcotic or alcohol. The officers did not coerce, threaten, or promise Wilson anything in exchange for his statement, nor was Wilson deprived of food, restroom access, or any other basic necessities. Wilson kept his cellular phone with him at the police station and even made several phone calls while Detective Lindley was out of the room. Wilson voluntarily provided a statement regarding his whereabouts on the evening before and the morning of Trishawn's murder. Afterwards, Wilson left the police department and was not arrested until January 17, 2003.

The trial court determined that Wilson was not in custody. Wilson was never

told, before or during his interviews with Detective Lindley, that he was in custody; in fact, he was specifically told that he was not in custody. The interviewing detective also testified that Wilson's movement was never physically restrained or obstructed. As such, the detective's testimony that Wilson freely went to the station, was never restrained in his movements, and was free to leave at all times as communicated to him support the trial court's finding. Under these circumstances, it was within the trial court's purview to conclude that a reasonable person would have believed that they were free to leave. Because Wilson was not in custody while being questioned, the failure to advise him of his rights did not make the statements inadmissible under either *Miranda* or article 38.22. Consequently, we conclude that the trial court did not abuse its discretion in denying Wilson's motion to suppress. Accordingly, we overrule Wilson's second issue.

### EXPERT TESTIMONY OF CRYSTAL DANKO

 Wilson next claims the trial court erred in admitting Crystal Danko's testimony on cell phones as an expert under Rule 702. TEX.R. EVID. 702. A trial court has broad discretion in determining the admissibility of evidence and will not be reversed absent a clear abuse of discretion. *Williams v. State*, 535 S.W.2d 637, 639–40 (Tex.Crim.App.1976). An abuse of discretion occurs when the trial court acts without reference to guiding rules or principles or acts arbitrarily or unreasonably. *Galliford v. State*, 101 S.W.3d 600, 604 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd). The trial court has the responsibility to ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion. *See Matson v. State*, 819 S.W.2d 839, 851–52 (Tex.Crim.App. 1991).

The State called Sprint employee Danko as the custodian of Wilson's cellular phone records to lay the appropriate predicate under the business records exception to the hearsay rule. TEX.R. EVID. 803(6). The records were admitted, but in addition to being the custodian of the records, the State also sought Danko's opinions as an expert regarding the interpretation of those records based on her training and experience. Danko explained that the signal from a cellular phone is transmitted from cellular towers, usually transmitting from the tower closest to the person placing the phone call. If the individual is moving, the signal may be pulled from a different tower. The phone records denote the first tower accessed when the call began and the last tower utilized when the call ended. Each tower has a general range of up to three miles, with three different sectors showing the direction of the call.

Danko explained that the location of the cellular towers and Wilson's cellular phone records reflect a map of Wilson's movements on the morning of December 26, 2002. Specifically, Danko testified that the data revealed four specific movements that could be identified: (1) prior to 8:00 a.m., Wilson's cellular phone traveled from the area where Wilson's and Espinosa's residences were located to the area where the Fifer house was located, (2) the cellular phone then traveled back to the area of town near Wilson's and Espinosa's residences, (3) the cellular phone traveled back to the Fifer's residence shortly after Officer Anders requested that Wilson come to the residence and (4) the cellular phone traveled to the police station thereafter. The accuracy of the last two trips was confirmed by Wilson's presence at the crime scene and at the police station.

The State argued that Danko's employment with Sprint for over four years, in

conjunction with her training and experience, qualified her as an expert to interpret the records. Danko's assigned duties included accessing customer records in order to provide the tower sites and addresses from which telephones pull their signals. Danko has a Bachelor's Degree in Criminal Justice, four to six months of electronic surveillance training from Sprint and was familiar with the computer programs utilized in the retrieval of information. Danko also stated that she had testified in court multiple times regarding the tracking of cellular phone calls. Although Danko admitted that she did not have any specialized expertise in cellular phone technology or the underlying scientific theories associated therewith, she was steadfast in her familiarity with tracking cellular phones through their use of cellular towers and testified that she possessed sufficient knowledge, education and training, as well as a general understanding of the principles applied to cell phone technology, to interpret the records in question. More importantly, she performed this type of analysis frequently, often for use by law enforcement and 911 operators. Based on Danko's education, training, and experience, the trial court admitted her expert testimony under Rule 702.

## ANALYSIS

 In addressing the admissibility of scientific and nonscientific evidence, the trial judge determines whether the proffered witness is a qualified expert and whether the proffered testimony is reliable. Rule 702 does not provide a bright line test as to whether expert testimony is admissible.[2] TEX.R. EVID. 702.

The Dallas Court of Appeals recently addressed a similar review in *Brown v. State*, 163 S.W.3d 818, 824 (Tex.App.-Dallas 2005, pet. ref'd). In *Brown*, the appellant argued the State's witness on GPS technology was not qualified under Rule 702. *Id.* The expert testified that: (1) he worked with GPS on a daily basis to prepare maps and pinpoint the location of residences for various purposes, including 911 operators; (2) that GPS works by bouncing signals from several satellites in order to triangulate the receiver's location; (3) that GPS technology is accurate; and (4) that GPS is accepted as valid in many civilian, as well as military, applications requiring positioning data. *Id.* The witness' expertise in GPS technology was established through his work experience and training and not through a formal background or education in the underlying scientific principles of GPS technology. *Id.* See also *Alvarado v. State*, 912 S.W.2d 199 (Tex.Crim.App.1995) (holding officer's 60 hours of training at two different police departments, that he had read a book on the subject and that the methods used in interpretation of bloodstains were of the type relied upon by experts in the field was sufficient); *Emerson v. State*, 880 S.W.2d 759, 766–67 (Tex.Crim.App.1994) (holding that officers' certification in HGN testing based on 40–hour course consisting of 24 hours of classroom instruction and 16 additional hours of field evaluations qualified him as an expert).

In *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex.1998), the Texas Supreme Court acknowledged that "experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case." Similarly, in *McLaughlin, Inc. v. North-*

---

2. TEX.R. EVID. 702 "Testimony by Experts":
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a

fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

*star Drilling Technologies, Inc.,* 138 S.W.3d 24, 29–30 (Tex.App.-San Antonio 2004, no pet.), we reviewed an expert's testimony regarding the performance of an automobile guiding system. In finding that the trial court did not abuse its discretion, we looked to the expert's education and experience in the business. *Id.* at 30. And although never having actually operated a TruTracker system, "he explained how the TruTracker works and how to analyze the data received. He stated that he has evaluated TruTracker data on directional bores between 80 and 100 times." *Id.*

Just like the technician in *Brown* and the expert in *Northstar Drilling,* Danko's training and experience allowed her to understand and interpret the computer generated records. The trial court determined Danko possessed "specialized knowledge which the court believes could or would assist the trier of facts to understand something that is in issue and ... her skill, experience, training and knowledge," would provide assistance to the jury on the point at issue. It is reasonable to conclude, given Danko's background, that her explanation of the reports and the information contained therein, specifically the incoming and outgoing calls, cell tower locations and general technology with regard to tracking cellular calls, would assist the trier of fact to better understand the evidence or to determine a fact in issue. *See* Tex.R. Evid. 702. The record further supports that officers and emergency vehicles relied on Danko to make similar interpretations on a daily basis. Under this record, the trial court did not abuse its discretion in admitting Danko's testimony. Accordingly, Wilson's third issue is overruled.

### ADMISSIBILITY OF STATEMENT'S MADE BY JOLIE FIFER

 Wilson next argues the trial court improperly admitted testimony reflecting the statements of Jolie Fifer in violation of the Confrontation Clause. A trial court's admission of hearsay statements as excited utterances is reviewed under an abuse of discretion standard. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex. Crim.App.2003). An abuse occurs only upon a determination that the "judge's decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree." *Id.*

### ANALYSIS

The statements about which Wilson complains were made shortly after the murder, to the child's father, in the presence of Officer Anders. Tex.R. Evid. 803(2) provides "a statement made while the declarant was under the stress of excitement caused by the event or condition" is an exception to the hearsay rule and not excluded even though the declarant is available as a witness.

The *Zuliani* Court explained that a Confrontation Clause analysis first requires a determination of whether the statement is testimonial or nontestimonial, setting forth examples of testimonial as prior testimony at a preliminary hearing, before a grand jury, or at a former trial and in response to police interrogations. *Zuliani,* 97 S.W.3d at 595. *See also Wall v. State,* 184 S.W.3d 730 (Tex.Crim.App.2006). This analysis is a procedural question, not a rule of evidence. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

The Austin Court of Appeals extensively analyzed Texas and other states' jurisprudence in determining whether a statement is testimonial in a factually similar case, *Lagunas v. State,* 187 S.W.3d 503 (Tex. App.-Austin 2005, no pet. h.). In *Lagunas,*

the court addressed whether a four year old girl's statements to an officer that a bad man had killed her mother and had taken her away were testimonial. The child was not called to testify. The Court identified several common factors: (1) the spontaneity of the statement; (2) to whom the statement was made (e.g. a police officer, friend or acquaintance); (3) the age or maturity of the declarant, specifically would the declarant reasonably know the accusations made to a police officer would reach prosecutorial authorities and be used against the accused; and (4) the nature of any law enforcement involvement. *Id.* Based on this criteria, the *Lagunas* court held that the child's statements made to the officer were nontestimonial and did not violate Lagunas' right of confrontation. *Id.*

There is little question that four year old Jolie Fifer had difficulty communicating with the first officers arriving at the residence. Although Jolie is not hearing impaired, she clearly had delayed speech aptitude. Officer Anders testified that although he had several courses in American Sign Language, because of Jolie's age and state of mind, some of her signs were difficult to understand. He described witnessing a scared and upset little girl run to her father's arms and relay, in sign and verbally, "Mommy cry, stepfather choke, cry, floor, green" and then "truck." Anders admitted he requested assistance from Nathaniel regarding the sign for "stepfather," but was able to later confirm that it is an abbreviated form of the formal American Sign Language sign for "stepfather." Additionally, Anders witnessed Jolie become visibly shaken by the presence of Wilson at the scene, exclaiming "scary, scary, bad man."

Similarly, Jolie's statement was made to her father, spontaneous to Nathaniel's arrival and shortly after possibly witnessing her mother's murder, and cannot be reasonably akin to any type of interrogation by an officer. Moreover, it is illogical to conclude that a four year old child would have considered whether the statements would be used against Wilson. *Id.* As in *Lagunas,* Jolie's statements to her father are nontestimonial and do not violate Wilson's right of confrontation. Accordingly, the statements comply with Rule 803(2) and are not excluded by the hearsay rule, regardless of whether Jolie was available as a witness. Wilson's fourth issue is overruled.

### SUFFICIENCY OF THE EVIDENCE

Finally, Wilson contends the evidence is legally and factually insufficient to substantiate his guilt. When reviewing the legal sufficiency of evidence, an appellate court utilizes the traditional standards of review. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard of review is the same whether the evidence is direct, circumstantial, or both. *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex.Crim.App. 1999). This court examines whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt. *See* TEX. PENAL CODE ANN. § 2.03(d) (Vernon 2003); *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App.1991). In performing a factual sufficiency review, deference is given to the fact finder's determinations, with regard to the credibility and demeanor of witnesses. *Zuniga v. State,* 144 S.W.3d 477, 481 (Tex.Crim.App. 2004); *Cain v. State,* 958 S.W.2d 404, 408 (Tex.Crim.App.1997). An appellate court may not substitute its judgment for that of the fact finder and will not set aside the judgment unless the evidence supporting the verdict is so weak as to be clearly

wrong and manifestly unjust. *Zuniga*, 144 S.W.3d at 481–82.

### ANALYSIS

■■■ A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual" or if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PEN.CODE ANN. § 19.02(b)(1), (2) (Vernon 2003).[3] By virtue of the indictment, the State was required to prove that Wilson intentionally or knowingly caused the death of Trishawn Fifer by strangling Trishawn with a deadly weapon, namely his hands or a ligature or that he intended to cause serious bodily injury to Trishawn by committing an act clearly dangerous to life by strangling Trishawn and thereby caused her death.

Wilson's argument focuses not on whether Trishawn was strangled, but simply by whom. The State's case is primarily comprised of the excited utterance of a four year old child with limited communication skills, testimony placing a vehicle of the same make and model as Wilson's in the victim's driveway at the approximate time of the murder, Wilson's inconsistent statements to officers and the cellular phone records tracking Wilson's approximate location throughout the morning of the murder.

Jolie's statements provided evidence that Wilson was the individual who hurt her mother and the uncontroverted description of the vehicle in front of the victim's home was further evidence of Wilson's presence at the scene. Moreover, Wilson's cellular phone records on the morning of December 26, 2002, indicate that Wilson was traveling across town to within a few miles of the victim's home.

Finally, however, the State relied on a plethora of inconsistent statements by Wilson. In an apparent attempt to create an alibi and refute the neighbor's vehicle identification, Wilson told Officer Lindley that he did not have his vehicle early that morning and his daughter-in-law had used his vehicle the prior evening, complete with details about where she had gone. Yet during the trial, Wilson's daughter testified that she had used the vehicle the evening before the murder but returned it the following morning. But more importantly, Wilson's principal alibi, Marissa Espinosa, could not corroborate his version of events. Wilson claimed he spent the night at his residence while Espinosa stated that he spent the night with her. Wilson asserted that they were just working acquaintances. This was, at first substantiated by Espinosa, but she later confessed that they were in fact intimate. Wilson next claimed that he met Espinosa in the parking lot at Albertsons the morning of the murder. Once again Espinosa's first statement claimed that she met Wilson in the parking lot, but she later explained that Wilson picked her up and told her to say that he had met her at Albertsons. Wilson asserted that he woke up at his residence a little before 7:00 a.m. and then laid in bed making phone calls until shortly before 8:00 a.m. This was contradicted by Espinosa's second statement in which she told officers that she took Wilson home around 6:00 a.m. and was surprised when he came back to pick her up shortly after 8:00 a.m. Moreover, the cellular phone records show Wilson's cellular phone moving from tower to tower, closer to the victim, at that time. Finally, while at the police

---

**3.** The current version of Section 19.02 of the Texas Penal Code was the applicable law at the time these crimes took place.

department, Officer Flores overheard Wilson on his cellular phone explaining that "they should try and convince" the officers that Wilson was at home that morning.

Wilson's trial counsel spent a great deal of time and energy on these exact issues during cross-examination. He aggressively attacked Danko regarding the cellular phone records and her ability to interpret them. He questioned the veracity of Jolie's identification, the determination of Wilson's whereabouts and even the voluntariness of Wilson's statement. Moreover, the jury heard Deandra Wilson, Wilson's daughter and Trishawn's half-sister, accuse Nathaniel of the crime.

The defense presented several witnesses, including Deandra, who testified that she saw an older white man at Trishawn's residence the day of the murder and also at her wake. The same man allegedly confronted Deandra claiming that Nathaniel owed him money. Deandra also testified that Jolie indicated that a "Victor" told her that mommy was sleeping. Under cross-examination, Deandra admitted that she did not provide this information to the police officers at the scene or the following day when she gave her statement. Moreover, she was steadfast in her conviction that Nathaniel had murdered Trishawn, not the unidentified white man. During cross-examination, Deandra testified that her father's violent temper and unpredictable behavior led to her mother's perceived need to hide from her father. Finally, Deandra testified she had used her father's Montero Sport the evening before, but had left it the following morning with plenty of gas.

Because the jury could have reasonably believed Jolie's identification, Wilson's presence at the scene of the crime and that Wilson's statements amounted to a furtive attempt to provide an alibi, there was sufficient evidence upon which the jury could find Wilson guilty of the alleged offense. Even taking the great amount of circumstantial evidence upon which this case is based, one cannot say the jury's conclusion that Wilson committed the charged offenses is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. Moreover, even in a neutral light, the evidence cannot be said to be too weak to support the findings of guilt beyond a reasonable doubt. Because the jury has the exclusive responsibility of reconciling conflicts in the testimony, this court will not substitute its judgment. *See Jones v. State,* 944 S.W.2d 642, 647 (Tex. Crim.App.1996). We overrule Wilson's legal and factual insufficiency issue.

### CONCLUSION

The judgment of the trial court is affirmed.