Memorandum Opinion of November 9, 2006 Withdrawn; Affirmed and
Substitute Memorandum Opinion filed November 14, 2006








Memorandum
Opinion of November 9, 2006 Withdrawn; Affirmed and Substitute Memorandum Opinion filed November 14,
2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00634-CR

____________

 

GARY DOMINIC EDWARDS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 185th
Judicial District

Harris County, Texas

Trial Court Cause No. 978,667

 



 

S U B S T I T U T E    M E M O R A N D U M   O P I N I O N

We withdraw our memorandum opinion of November 9, 2006 and
substitute the following in its place.

A jury convicted appellant Gary Dominic Edwards of the
murder of Lonny Smulian and assessed punishment at thirty-five years= confinement in
the Institutional Division of the Texas Department of Criminal Justice.  In a
single issue, Edwards challenges the legal and factual sufficiency of the
evidence supporting his conviction.  We affirm.








I.  Factual and
Procedural Background

Gary Dominic Edwards and Anthony Gibson were very close
friends.[1] 
According to testimony offered at trial, Edwards is five or six years older
than Gibson, who was seventeen years old at the time of these events.  Although
the two were not related, they held themselves out as brothers. 

On the evening of February 21, 2004, Edwards was stabbed on
his arms with an ice pick or screwdriver at the Roadrunner Hotel.  According to
Edwards, his attacker was a man known to him only as John; however, Edwards
believed that John was a friend of Lonny Smulian,[2]
who lived in room 111 of the hotel.  After the attack, Edwards went to room 113
of the hotel looking for Gibson.[3] 
Gibson was not there, but Rolanda Pouncy and David Seraphin were in the room,
and Seraphin let Edwards in.  Edwards told Pouncy he had been stabbed and asked
her to call Ahis brother,@ Gibson. 
According to Pouncy, she told Edwards he needed to go to a hospital, and
persuaded him to lie down while she got a towel to clean him.  Pouncy did not
immediately call Gibson as Edwards asked, but instead called her friend
Courtney Johnson[4]
for advice.  Johnson arrived about fifteen minutes later.  








Eventually, Pouncy decided to call Gibson to drive Edwards
to a hospital.[5] 
She testified that when she told Gibson that Edwards had been stabbed, Gibson A[w]ent ballistic@ and demanded to
know who stabbed his brother and where he was.  Pouncy told Gibson that she and
Edwards were in Gibson=s hotel room.  Pouncy further testified
that before Gibson arrived, Smulian, who lived two doors down, knocked on
Gibson=s door and tried
to persuade Edwards to come to his room.  Smulian reportedly asked, AWhat happened to
my room?  It=s a mess.  It=s ramshacked
[sic], you know.@  Pouncy stated she refused to let Smulian
in, but told him that Gibson was on his way.  She further testified that
Smulian and Gibson did not get along well together, and that Smulian had
returned to his room.  

Gibson and his girlfriend, Crystal Sosa, arrived at the
hotel between 1:00 and 2:00 a.m.  Gibson was enraged; he brandished a gun,
fired at least two shots, and demanded to know who had stabbed Edwards.  As
Johnson later testified:

Johnson:      [Gibson] pulled it
[the gun] to myCmy head, know what I=m saying, he pulled it to my head
and he was like, Did you cut him up, know what I=m saying?  I was like, No, and then he asked meCthen he asked [Edwards], know what
I=m saying, shouldChe cocked it, then he asked
[Edwards], know what I=m saying, should he shoot me.

State:           Let=s stop real quick.  He cocked the
gun and asked [Edwards] whether or not he should kill you?

Johnson:      Yeah.

State:           He went to
[Edwards] for the answer to that question?

Johnson:      Yes, sir.

* * * * *

State:           What did [Edwards]
say when he asked whether or not you should be killed.?

Johnson:      [Edwards]
didn=t say nothing.

Pouncy
also testified that Gibson put a gun to Johnson=s head and asked
Edwards, ADo you want me to kill him?  I=ll kill him for
you, brother.@  Like Johnson, Pouncy testified that Edwards said
nothing in reply.  








Johnson left the room, and according to Pouncy, Gibson put
the gun to Seraphin=s head and forced him to remove his
clothes.  Pouncy testified that Gibson=s Aranting and raving@ lasted for
approximately a half-hour before Gibson was persuaded to put down the gun. 
Before Edwards left with Gibson and Sosa, Pouncy told Sosa to take Edwards to a
hospital.  Pouncy watched the three leave in Seraphin=s truck, then she
and Seraphin went to another room in the hotel and smoked crack cocaine;
however, she continued to go in and out of the room throughout the night.

At around 4:00 or 5:00 a.m., Pouncy saw Seraphin=s truck in an
alley near room 109. Pouncy wanted to get the keys from Gibson so that Seraphin
could leave.  She returned to Seraphin and told him his truck was outside, but
Seraphin refused to move.  Pouncy went outside again and saw Gibson and a
shorter person in a black leather jacket knocking at Smulian=s door.[6] 
Pouncy was frightened; she knew that Smulian and Gibson didn=t like each
other.  She returned to the room, called Johnson, and asked him to A[c]ome and see
what=s going on.@  After calling
Johnson, Pouncy again went outside, and although she could still see Seraphin=s truck, the two
people who had been outside Smulian=s room were no
longer there.  

Johnson got a ride back to the hotel, and as he approached
Smulian=s room, he could
hear Smulian screaming loudly.  Johnson called to Smulian, ABonsai, what=s wrong?@  Smulian
answered, ACall security.@  Johnson could
hear sounds of a struggle in the room and heard one or more male voices saying,
Amove@ or Ashut up.@  He told Smulian
to open the door, but Smulian repeated, ACall security.@








Johnson went to the hotel=s front office and
asked the hotel clerk to check on the person in room 111.  The hotel employee
called Smulian=s room, but there was no answer, and the clerk refused
to get further involved.  Johnson then called a taxi and left the hotel without
returning to Smulian=s room.

Jennifer Dangona was staying in room 211 directly above
Smulian=s room with a
friend she identified as AKeith.@  At 5:25 a.m.,
Dangona heard a gun shot from the room below.  According to her testimony at
trial, she heard Amore than two@ male voices
yelling in room 111.  Five more shots were fired, with approximately thirty
seconds between each shot.  After the sixth shot, Dangona could hear a man
pleading for his life.  Dangona and Keith hid in the closet of the room, and
Keith called 911 on Dangona=s cell phone, but no one came to the hotel
to investigate. 

The next morning, a member of the hotel=s housekeeping
staff called the hotel manager after discovering that the door to room 111 was
blocked and would not open.  The manager discovered Smulian=s body at about
noon on February 22, 2004.  Smulian had been shot twice in the chest, once in
the armpit, and once in the back of the left thigh.  The police officers who
first arrived at the scene testified that Smulian=s body was found
on the floor with a phone cord wrapped around it.  One bloodstained bedspread
was heaped next to the body, and another remained on a bed. 

Based on an anonymous tip, police arrested Edwards and
Gibson a few days later.  The murder weapon was never recovered.  DNA evidence
later showed that the bedspread heaped on the floor beside Smulian=s body was stained
on one side with Edwards=s blood and on the other side with Smulian=s blood.  The
bedspread that remained on the bed was stained with Smulian=s blood.  

Edwards presented no evidence at trial.  A jury convicted
him of murder and assessed punishment at thirty-five years= imprisonment.[7] 
This appeal ensued.








II.  Issue
Presented

In his sole issue, Edwards contends the evidence is legally
and factually insufficient to support his conviction.  We disagree.

III.  Standard of Review

A.      Legal Sufficiency

After being
instructed that it could convict Edwards either as the principal actor in
Smulian=s murder or as a
party to the offense, the jury returned a general verdict of guilty.  The
evidence is legally sufficient if it supports either theory. See Rabbani v.
State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992) (en banc).  When
reviewing the legal sufficiency of the evidence, we examine the evidence in the
light most favorable to the verdict to determine whether any rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789
(1979); Mason v. State, 905 S.W.2d 570, 574 (Tex. Crim. App. 1995) (en
banc).         A person commits murder if he intentionally or knowingly causes
the death of an individual.  Tex. Penal
Code Ann. _ 19.02(b)(1) (Vernon
2003).  He acts as a principal if  he intends to cause serious bodily injury
and commits an act clearly dangerous to human life that causes the death of an
individual.  Id. at _ 19.02(b)(2).  He acts as a party if
he intentionally promotes or assists the commission of the offense by
soliciting, encouraging, directing, aiding, or attempting to aid another person
to commit the offense.  Id. at __ 7.01, 7.02.  Circumstantial
evidence alone can be used to prove a person is a party to an offense.  Powell
v. State, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006).  AEach fact need not
point directly and independently to the guilt of the appellant, as long as the
cumulative effect of all the incriminating facts are sufficient to support the
conviction.@  Guevara v. State, 152 S.W.3d 45, 49 (Tex.
Crim. App. 2004) (affirming conviction of appellant as a party to his wife=s murder based on
motive, conflicting statements, and other circumstantial evidence).








B.      Factual Sufficiency

In reviewing the
factual sufficiency of the evidence, we view all the evidence in a neutral
light and set aside the verdict Aonly if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.@  Cain v. State,
958 S.W.2d 404, 407 (Tex. Crim. App. 1997) (en banc) (quoting Clewis v.
State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996) (en banc)).  Before we
may reverse for factual insufficiency, we must first be able to say, with some
objective basis in the record, that the great weight and preponderance of the
evidence contradicts the jury=s verdict.  Watson v. State, No.
PD-469-05, 2006 WL 2956272, at *10 (Tex. Crim. App. Oct. 18, 2006).  When
reviewing the evidence, we must avoid intruding on the factfinder=s role as the sole
judge of the weight and credibility of the witness testimony.  Johnson v.
State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000) (en banc).  We do not
re-evaluate the credibility of witnesses or the weight of evidence, and will
not substitute our judgment for that of the factfinder.  Johnson v. State,
967 S.W.2d 410, 412 (Tex. Crim. App. 1998).   

IV.  Analysis

A.      The Evidence is Legally Sufficient to Support the Conviction.

Edwards concedes
that Pouncy=s testimony places Edwards at Smulian=s door shortly
before shots were fired.  He also admits that the bedspread stained with
Edwards=s blood places him
inside Smulian=s room at some time, but correctly points out that
there is no forensic evidence establishing when this occurred.  Finally,
Edwards points out that on cross-examination, Pouncy testified that Gibson told
Edwards that if Smulian Ahad anything to with@ Edwards=s stabbing, Gibson
would kill him.  According to Pouncy, Edwards told Gibson that Smulian Adidn=t have anything to
do with it.@  Thus, Edwards argues, the evidence provides no more
than a suspicion that he was involved in Smulian=s death. 








We disagree.  Both
Johnson and Pouncy testified that Gibson asked Edwards whether he should kill
Johnson, and when Edwards did not answer, Gibson allowed Johnson to leave.  The
jury could have inferred from this testimony that, in deciding how to retaliate
for Edwards=s stabbing, Gibson placed himself under the direction
of his older Abrother,@ Edwards.  Pouncy
also testified that the person in the black jacket who was knocking on Smulian=s door was
Gibson.  She was cross-examined about prior statements in which she identified
the person in the black jacket as Sosa; however, we presume the jury credited
her explanation and found her testimony in this case credible.  See, e.g.,
Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000) (stating that
inconsistencies in testimony are resolved in favor of the verdict when
conducting a legal sufficiency review).  Dangona testified there were Amore than two@ male voices in
the room, and Johnson testified that the voices he heard coming from Smulian=s room during the
crime could have come from both Gibson and Edwards.  

Taken together,
the evidence is legally sufficient to support the conclusion that Edwards aided
or encouraged Gibson to kill Smulian.  Accordingly, we hold the evidence is
legally sufficient to support Edwards=s conviction.

B.      The Evidence is Factually Sufficient to Support the Conviction.

In conducting a
factual sufficiency review, we must discuss the evidence appellant claims is
most important in undermining the jury=s verdict.  Sims
v. State, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003).  Edwards argues that
only three pieces of evidence support the jury=s verdict: (1)
Pouncy=s testimony that
she saw Edwards outside Smulian=s door shortly before the murder, (2)
Johnson=s testimony that a
voice he heard in Smulian=s room may have been Edwards=s, and (3) Edwards=s blood found on a
bedspread in Smulian=s room.  But, according to Edwards, this
evidence is factually insufficient to support his conviction.[8]








We disagree with
Edwards=s premise;
additional evidence supports the jury=s conclusion that
Edwards was actively involved in the murder as a principal or as a party.
Earlier that night, Gibson held two people at gunpoint based on his suspicion
that they may have been involved in Edwards=s stabbing, yet
the uncontroverted testimony of both Pouncy and Johnson was that Gibson looked
to Edwards for agreement before shooting.  Because Edwards said nothing, Gibson
did not shoot.  Their testimony supports an inference that Gibson would not
have killed Smulian without Edwards=s encouragement. 

Pouncy further
testified:

State:           When you saw them,
who was closest to the door, [Gibson] or [Edwards]?

Pouncy:       [Edwards].

State:           Had you observed
[Smulian] and [Gibson] interact before?

Pouncy:       Yeah.  They didn=t like each other.

* * * * *

State:           Would [Smulian]
have opened the door for [Gibson]?

Pouncy:       I don=t think so.

State:           Would he have
opened the door for [Edwards]?

Pouncy:       Yes, sir.

From this
testimony, the jury could also infer that Edwards actively assisted Gibson to
gain access to Smulian=s room to commit murder. 








Additionally,  A>consciousness of
guilt= is perhaps one of
the strongest kinds of evidence of guilt.@  Torres v.
State, 794 S.W.2d 596, 598 (Tex. App.CAustin 1990, no
pet.).  Similarly, evidence that the defendant changed his story is some
evidence of guilt.  See Prieto v. State, 879 S.W.2d 295, 300 (Tex. App.CHouston [14th
Dist.] 1994, pet. ref=d).  Here, over defense objections, the
jury heard a recorded statement Edwards made to police at his own request some
days after his arrest.  In the space of a few minutes, Edwards gave several
inconsistent accounts of events.  In the first version, Edwards claimed that
when he pursued John, Smulian=s door was closed and Smulian was not at
the hotel, but Smulian came to room 113 in the time between the stabbing and
Gibson=s arrival.  In the
second version, Edwards said that Smulian came to room 113 to after Gibson=s arrival, and
with Gibson acting as a peacemaker, Edwards and Smulian shook hands.  These
first two versions do not explain why Edwards=s blood was on a
bedspread next to Smulian=s body, because in these accounts, Edwards
did not enter Smulian=s room.  In the third version, Edwards
entered Smulian=s room and sat on a bed while asking where
to find John.  In the fourth version, Edwards simply told Smulian about the
stabbing, but denied asking about John.  The jury was entitled to view Edwards=s repeated
revisions of his story as attempts to create a version that would comport with
the evidence.  Viewed in a neutral light, these changing statements are further
evidence of guilt.

In his recorded
statement, Edwards also stated that after he left the hotel with Gibson and
Sosa, Awe went to Susan=s house.  I gave my lawyer Susan=s number to show that I was there.  I
bled on her sheets, too, to show that I was there.@ Edwards=s statement that
he bled on Susan=s sheets Ato show that I was
there@ can also be
interpreted as an attempt to establish an alibi at a time when he should not
have known of the need for an alibi.  Like flight and inconsistent statements,
a defendant=s attempts to fabricate evidence support an inference
of consciousness of guilt.  See Johnson v. State, 583 S.W.2d 399, 409
(Tex. Crim. App. 1979); see also Wilson v. State, 195 S.W.3d 193, 204
(Tex. App.CSan Antonio 2006, no pet.) (considering the accused=s inconsistent
statements to police in Aan apparent attempt to create an alibi@ as part of the
evidence found legally and factually sufficient to support a murder
conviction).








Finally, Pouncy
testified that Edwards wrote her at least three times before his trial and
asked her to change her expected testimony.  A defendant=s efforts to
induce a witness to change or withhold testimony are a further indication of
consciousness of guilt.  Garza v. State, 172 Tex. Crim. 468, 470, 358
S.W.2d 622, 623 (1962) (considering evidence that the accused offered a police
officer seven hundred acres of land to Ahelp him get out
of this@ as part of a
challenge to the sufficiency of the evidence); see also Rodriguez v. State,
577 S.W.2d 491, 493 (Tex. Crim. App. 1979) (AHe told that
witness to drop the charges against him.  These are hardly the actions of an
innocent accused.  This evidence is every bit as probative of guilt, as would
be flight by the accused.@).

Viewing the
evidence in a neutral light, and considering the substantial evidence of
consciousness of guilt together with the circumstantial evidence of Edwards=s complicity, we
conclude the jury=s verdict is not contrary to the great
weight and preponderance of the evidence.  We overrule Edwards=s sole issue on
appeal.

V. Conclusion

We hold the
evidence is legally and factually sufficient to support Edwards=s conviction for
the murder of Lonny Smulian.  Accordingly, we affirm the trial court=s judgment.

 

 

 

/s/      Eva M. Guzman

Justice

 

 

Judgment rendered
and Substitute Memorandum Opinion filed November 14, 2006.

Panel consists of
Chief Justice Hedges and Justices Yates and Guzman.

Do Not Publish C Tex. R. App. P. 47.2(b).

 









[1]  Edwards and Gibson were referred to by most
witnesses as ABoo@ and ANo-No.@





[2]  Smulian was nicknamed ABonsai.@





[3]  According to testimony presented at trial, room 113
was rented to Gibson; however, in an unsworn recorded statement made after his
arrest, Edwards referred to the room as ACrystal=s room.@ 
Crystal Sosa was Gibson=s girlfriend.  Regardless of whether the room was
registered in the name of Gibson or Sosa, it is undisputed that Edwards went to
the room looking for Gibson.





[4]  At trial, witnesses frequently referred to Johnson
as AFoe.@





[5]  Seraphin had rented his vehicle to Gibson.





[6]  In Gibson=s
trial for the murder of Smulian, Pouncy testified that she had seen Gibson and
Sosa in front of room 111 at this time.  When cross-examined about her
testimony in the Edwards trial, Pouncy said the inconsistency was due to the
fact that Sosa and Edwards had similar jackets.  





[7]  In a separate proceeding, Gibson was also convicted
of first-degree murder and sentenced to seventy years= confinement.  Gibson v. State, No.
14-05-00220-CR, 2006 WL 909485, at *1 (Tex. App.CHouston [14th Dist.] April 11, 2006, pet. ref=d) (mem. op., not designated for publication).





[8]  Specifically, Edwards argues that this evidence may
preponderate in favor of guilt, but does not prove the elements of the crime
beyond a reasonable doubt.  This argument relies on language articulated in Zuniga
v. State, 144 S.W.3d 477, 485 (Tex. Crim. App. 2004) that has since been
overruled by Watson v. State, No. PD-469-05, 2006 WL 2956272, at *10
(Tex. Crim. App. Oct. 18, 2006).  At the time Edwards=s appeal was briefed, he did not have the benefit of
the Watson opinion; therefore, we will construe his brief to argue that
the evidence is factually insufficient to support his conviction under the
governing standard of review as set forth in Watson and Cain.