

**NUMBER 13-08-00614-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI – EDINBURG**

---

**CLIFFORD SUTTON,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                              **Appellee.**

---

**On appeal from the 130th District Court
of Matagorda County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Rodriguez, Benavides, and Vela
Memorandum Opinion by Justice Benavides**

Appellant, Clifford Sutton, appeals his conviction for burglary of a habitation. *See* TEX. PENAL CODE ANN. § 30.02(a)(1), (d)(2) (Vernon 2003). After a jury trial, the jury sentenced Sutton to life imprisonment in the Texas Department of Criminal Justice—Institutional Division and assessed a $10,000 fine and court costs. *See id.* §

12.32 (Vernon Supp. 2009) (providing sentencing range for first-degree felonies). By three issues, Sutton argues that the evidence is legally and factually insufficient to support the jury's verdict and that the trial court erred by refusing his request for a jury instruction under article 38.23 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005). We affirm.

## I. BACKGROUND

On October 10, 2007, Sutton was indicted on two counts of burglary of a habitation. Both counts alleged that on or about June 4, 2007, Sutton entered the home of Evelyn Jurasek without her consent and with the intent to commit a felony. Count one alleged that Sutton entered with the intent to commit injury to an elderly person; count two alleged that Sutton entered with the intent to commit aggravated sexual assault. The case was tried to a jury.

Evelyn testified at trial that in June of 2007, she was seventy-five years old. She stated that she lived with her son Albert. Sutton, who goes by "Roy," was Evelyn's neighbor. Evelyn explained that she typically went to bed between 8:00 and 9:00, and if Albert was going out, she would leave the door to her house unlocked for him.

Evelyn testified that on June 4, 2007, she went to bed at her usual time, and Albert left to go to a "beer joint." When Evelyn went to bed, no one else was in the house. Evelyn stated that she was asleep when Sutton came into her house, entered her bedroom, and touched her foot, waking her up. She sat up on the edge of her bed, and Sutton kneeled by her bed and said he wanted "some sex." Evelyn told him, "No, you ain't going to get none." Evelyn denied that Sutton had ever asked for sex before or that she had ever had "relations" with him.

2

After refusing to have sex with Sutton, Evelyn pushed him away. Sutton pushed her down on her bed and scratched her face. Evelyn claimed that Sutton put his fist in her mouth and grabbed her tongue. She opined that Sutton must have torn her tongue because afterwards, she could not speak or swallow. Evelyn said she began calling for help, and Sutton then pulled her hair. She explained that when she got up to go to the living room, Sutton tore her nightgown, and at some point, she fell and passed out.

Some time after Sutton left, Albert came in. Evelyn told Albert that Sutton had raped her. She explained that she saw all the blood on the bed, and that is why she thought he raped her, but later she realized that the blood came from her face and that she had not been raped. The police arrived, and Evelyn went to the hospital.

Evelyn testified that at some point prior to June, Albert's son Clint, his girlfriend Ashley, and their children lived in the house with Evelyn and Albert, but Evelyn said they had already moved "when [she] got raped." Clint and Ashley were friends with Sutton, and Sutton would come over to Evelyn's house every morning. Evelyn testified that the door was always unlocked during the day, and Sutton would "just come[] in." Evelyn testified, however, that after Clint and Ashley moved out, Sutton did not come over every day, and he only came to her house when Clint and Ashley were there.

Evelyn admitted that one time, Sutton helped Albert clean up her yard, and occasionally she and Albert would sit on the porch with Sutton and drink beer, but he was not her friend. Although Sutton would come to her house to visit Albert occasionally, he would stay in the yard or would come inside the house with Albert's permission. When asked if she ever invited Sutton to her home, Evelyn said she did not because she "never did like him." She testified that on the night of June 4, 2007, Sutton did not have

3

permission to come into the house and that he had never come to her house at 1:30 a.m. prior to that night.

Albert testified that Clint, Ashley, and their three children had moved out of Evelyn's house two months before the incident. Albert said that Ashley and Sutton were friends, and Sutton would come over to the house to visit during the day and at night. He testified that occasionally, Sutton would come over and drink beer on the front porch with Evelyn and him. Albert stated that the house was usually unlocked, but he denied that Sutton had permission to come in and out of the house whenever he wanted. Rather, Albert testified that Sutton would "knock on the door or holler, you know, it's Roy, you know, and come on in." If no one was home, Sutton did not have permission to enter the house.

On cross-examination, Albert testified that occasionally Evelyn would give Sutton permission to enter the home and that Sutton was friendly towards Evelyn prior to the incident on June 4. He stated that Sutton would come over "all the time when Clint and Ashley were there." On re-direct, however, Albert clarified that Sutton did not have the right to "come and go" when no one was home or if the house was "totally dark."

Albert testified that on June 4, 2007, he and Evelyn sat on the front porch drinking beer from about 7:00 p.m. until 9:00 p.m. Evelyn went to bed, and Albert went to the Wet Spot Bar. Albert testified that Sutton was there. Albert stated that he stayed at the bar until about 1:30, but Sutton had already left by that time. Albert walked from the bar to Evelyn's house, which took about ten to twelve minutes. When he arrived at the house, he noticed that the light was on in Evelyn's bedroom. The door was locked, and he went inside the house and pushed open the door to Evelyn's bedroom. He saw her sitting on the edge of her bed, and she had a bump on her head and blood on her face. When he

4

asked what happened, Evelyn said, "Roy." Albert thought she meant that he should get Sutton to help, so he went next door, "banged" on the gate, and "hollered." No one came out, so Albert went back inside Evelyn's house and called 911.

Sergeant James Orr with the Matagorda County Sheriff's Office testified that he was working the night shift on June 4, 2007. He responded to a 911 call from Albert reporting an assault at the Jurasek residence. Sergeant Orr arrived at 1:57 a.m. to find Albert in the yard, and Albert informed him that Evelyn had been assaulted and was inside the home. Sergeant Orr then went into the residence. Sergeant Orr testified that he entered the residence through the front door, and he did not notice any damage to the door.

Once inside, he saw Evelyn, who he described as an "older" lady, "sitting in a chair in the living room[,] and she had blood all around her mouth[,] and it appeared that she had, like, a knot on her head. And she was—you know, visibly appeared to have been assaulted." He stated that her hair was in disarray and that she had trouble talking because "it appeared that something was, you know, wrong with her tongue . . . ."

Sergeant Orr asked Evelyn what happened. Evelyn said, "Roy wanted some. He came over to the house. And Roy wanted some." Sergeant Orr then asked, "What do you mean Roy wanted some?" Evelyn replied, "He wanted some of this" and then pointed at her vaginal area. Evelyn told Sergeant Orr that when she told Roy, "No," he struck her, tried to put his fist in her mouth, and choked her. Evelyn told Sergeant Orr that Roy lived next door.

Sergeant Orr testified that he called to make sure that an ambulance was on its way, and he continued to question Evelyn. He asked Evelyn if Roy had sex with her, and at that time, she said no. Sergeant Orr later explained that he asked this question because

5

Evelyn reported that Roy had been on top of her. Sergeant Orr stated that Evelyn reported to him that the incident occurred in her bedroom. He testified that he looked in the bedroom, that the bed appeared to be in disarray, and that there appeared to be blood on the sheets.

Evelyn explained to Sergeant Orr that her son, Albert, lived in the home with her and had been at a bar called the "Wet Spot." Evelyn told Sergeant Orr that she normally leaves the door unlocked so that Albert can get inside. She told him that the door was unlocked that night.

Sergeant Orr testified that his backup officer, Deputy Kenneth Head, arrived at the house at the time the EMS arrived. Evelyn was taken to the hospital, so he and Deputy Head went next door to try to locate Roy. Sergeant Orr explained that the Juraseks' home was in the middle of the block, and there is only one trailer house next to it on the west side, so the officers proceeded there first.

Sergeant Orr stated that he and Deputy Head walked around a gate to the trailer house and observed a man sitting on the back of a car with the hatchback open. Sergeant Orr asked the man's name, and he replied that his name was Clifford Sutton. Sergeant Orr asked Sutton, "Do you go by Roy?," and Sutton replied, "Yes." When Sergeant Orr approached him, Sutton said, "I've been waiting on you." Sergeant Orr testified that he noticed that Sutton was wearing only boxer shorts; Sutton had long, curly hair that appeared to be wet. Sergeant Orr stated that it appeared that Sutton had "just got out of the shower." When he asked Sutton if he had been at the Juraseks' house that night, Sutton told him no and claimed he had been at the Wet Spot Bar with Albert and had left the bar thirty minutes before Albert. Sergeant Orr explained that the Wet Spot Bar was

6

a block or two away from the Juraseks' home.  Sergeant Orr then asked Sutton if he had taken a shower, and Sutton said no.

After the conversation, Sergeant Orr handcuffed Sutton and informed him that he was being detained for investigation purposes.  He placed Sutton in the police car. Sutton's mother then came out of the house.  She identified herself as "Roy's mom."  She asked Sergeant Orr if she could bring Sutton some clothes, and he agreed.  Sergeant Orr then asked if she had seen the clothing that Sutton had on earlier that evening, and she provided those clothes.  Sutton's mother gave Sergeant Orr a t-shirt and a pair of shorts, and Sergeant Orr noticed that the clothing had "what appeared to be blood and possible feces on them."  The t-shirt was "soaking wet," but the shorts were dry.  Sergeant Orr testified that he transported Sutton to the criminal investigation division, where an investigator, Sergeant Bruce Page, was going to speak with him.  He stated that at this time, Sutton was not placed under arrest.

Charlotte Brown, an investigator with the Matagorda County Sheriff's Department, testified that she was dispatched to go to Matagorda General Hospital to meet with Evelyn. Brown described what she saw when she entered Evelyn's cubicle in the emergency room:

> What I first saw, Mrs. Jurasek was on one of the examining tables; and she was covered with a sheet up to about this area of her chest.  But I could see her face and her head, and she had blood all over her.  She had severe bruises on her face and a laceration on her right cheek where one of the bruises was.  Her tongue was swollen somewhat and protruding from her mouth, and I could see a laceration on her tongue.  So, from that appearance of her being bruised and bloody and the condition she was in, I believed that she had been beaten.

Brown testified that a nurse assisted her in pulling down the sheet so that she could view the rest of Evelyn's body.  Brown stated that there were bruises on Evelyn's body and

7

a large bite mark on her left breast. Brown explained that the bite mark "jumped right out at me because that is an indication of a sexual assault." According to Brown, a nurse named Laura Cervenka reported that Evelyn did not believe she had been raped during the incident, and an examination by a doctor revealed that there was no evidence that sexual intercourse had actually occurred.

The defense called two witnesses: Lisa Fiala and Richard King. Fiala testified that she is Evelyn's cousin and that she lived right across the street from Evelyn in June of 2007. Fiala stated that Sutton lived next door to Evelyn, also across the street from her house. She testified that Sutton "used to buy six-packs and go over to Evelyn and Albert's house[,] and they would sit there and drink. And they even went out and barbequed in the yard. Just had a nice good-ol' time." Fiala opined that Evelyn and Sutton "got along. They laughed and talked and drank beer together." When asked if she ever witnessed Sutton going in and out of Evelyn's home, Fiala replied, "Oh yeah. I'd sit underneath my garage and [Sutton] would go in and out of the house. I mean, he wouldn't even knock or nothing. He just walked in like, you know, it was his house." When asked if Sutton was going in and out of Evelyn's house regularly immediately before the incident occurred, Fiala stated, "Oh yeah. That was going on when Clint and his girlfriend were living there. They used to have parties and stuff over there." Fiala clarified, however, that from April 2007, when Clint moved out, until June 2007, when the incident occurred, Sutton continued to go in and out of Evelyn's house. Fiala believed that Sutton would enter and exit Evelyn's residence "six, seven times a day."

Richard King testified that he is Fiala's husband. He testified that he saw Sutton go over to Evelyn's house "just about every day, sometime [sic] every night." King clarified

8

that if Sutton was not working, he would go over to Evelyn's house "four or five times a day if he wasn't over there just about all day." King stated that he saw Sutton "walk in freely" and that he never saw Sutton stop, hesitate, or knock on the door. King believed that Sutton "got along" with Evelyn, and stated that Sutton would take beer over even if Albert was not there. He agreed that it appeared that Sutton could "come and go inside as he pleased."

After the close of the evidence, the jury was presented with a general verdict form that did not specify the count of burglary for which it asked the jury to find Sutton guilty. The jury found Sutton guilty of burglary of a habitation, sentenced him to life in prison, and assessed a $10,000 fine. This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

By his first and second issues, Sutton argues that the evidence is legally and factually insufficient to support a finding that he (1) entered Jurasek's home without her consent, and (2) entered with the intent to commit injury to an elderly person or aggravated sexual assault. For the reasons that follow, we disagree.

### A.    Standards of Review and Applicable Law

To assess whether the evidence supporting a verdict is legally sufficient, we consider all the evidence in the record in the light most favorable to the jury verdict and determine whether a rational jury could have found the defendant guilty of all the elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). "In reviewing the sufficiency of the evidence,

9

we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App.1985)). While each fact may not point directly and independently to the appellant's guilt, we may affirm "as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* Circumstantial evidence alone may be enough to establish guilt. *Id.*

When reviewing the evidence for factual sufficiency, we review the evidence in a neutral light to determine whether (1) the evidence is so weak as to render the jury verdict clearly wrong and manifestly unjust or (2) whether the evidence supporting the verdict is so outweighed by the great weight and preponderance of the contrary evidence as to render the verdict clearly wrong and manifestly unjust. *Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). We must show great deference to a jury verdict. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). "An appellate court judge cannot conclude that a conviction is 'clearly wrong' or 'manifestly unjust' simply because, on the quantum of evidence admitted, he would have voted to acquit had he been on the jury. Nor can an appellate court judge declare that a conflict in the evidence justifies a new trial simply because he disagrees with the jury's resolution of that conflict." *Id.* at 417.

We measure the legal and factual sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Grotti*, 237 S.W.3d at 280-81. Burglary can be committed in several different ways. *See* TEX. PENAL CODE ANN. § 30.02. Sutton was indicted under section 30.02(a)(1), which provides: "A person commits an

offense if, without the effective consent of the owner, the person . . . enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony, theft, or an assault . . . ." *Id.* § 30.02(a)(1). Section 30.02(f) further provides that if the person enters a habitation with the intent to commit a felony other than theft, the crime is punishable as a first-degree felony. *Id.* § 30.02(f).

The indictment alleged that Sutton entered Evelyn's home with the intent to commit the felony offenses of injury to elderly (Count I) or aggravated sexual assault (Count II). The hypothetically correct jury charge for burglary of a habitation with the intent to commit the felony of injury to the elderly would require the jury to find that (1) Jurasek was elderly; (2) Sutton entered her home at a time it was not open to the public; (3) without her effective consent; and (4) with the intent to cause Jurasek (a) serious bodily injury; (b) serious mental deficiency, impairment, or injury; or (c) bodily injury. *Id.* § 22.04 (Vernon Supp. 2009). The hypothetically correct jury charge for burglary of a habitation with the intent to commit aggravated sexual assault would require the jury to find that (1) Jurasek was elderly; (2) Sutton entered her home at a time it was not open to the public; (3) without her effective consent; and (4) with the intent to (a) cause the penetration of her anus or sexual organ by any means without her consent, (b) cause the penetration of her mouth by Sutton's sexual organ, without her consent, or (c) cause Jurasek's sexual organ, without her consent, to contact or penetrate Sutton's mouth, anus, or sexual organ. *See id.* § 22.021(a) (Vernon Supp. 2009).

"Consent" is defined by statute as assent in fact, whether express or apparent. *Id.* § 1.07(a)(11) (Vernon Supp. 2009). Consent is not effective if induced by force, threat, or

11

fraud. *Id.* § 1.07(a)(19)(A). A "person can make an unlawful entry by walking through an open door when the entry is without the owner's consent." *Evans v. State*, 677 S.W.2d 814, 818 (Tex .App.–Fort Worth 1984, no pet.). Direct testimonial evidence is not required to prove the lack of consent—it may be shown by circumstantial evidence. *Hathorn v. State*, 848 S.W.2d 101, 107 (Tex. Crim. App.1992). Likewise, intent to commit assault may be inferred from the accused's acts, words, and conduct. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Sharpe v. State*, 881 S.W.2d 487, 489 (Tex. App.–El Paso 1994, no pet.) ("Appellant's intent to commit sexual assault can be inferred from his remarks and the circumstances surrounding his acts.").

## B.     Consent

Sutton argues that the evidence was legally and factually insufficient to support the jury's finding that he entered Evelyn's residence without her consent. Sutton points to testimony from Evelyn, Albert, King, and Fiala that Sutton came to Evelyn's house every day, and it was never locked. Sutton further points to testimony from King and Fiala that Sutton freely entered the home without hesitating or asking permission.

Evelyn and Albert testified, however, that Sutton did not have permission to enter the home whenever he pleased—rather, someone always gave him permission, whether it was Ashley, Clint, or Albert. Most importantly, Evelyn testified that Sutton never came to her house at 1:30 a.m. and did not have permission to enter at that hour of night.

Evelyn's testimony that she did not give permission for Sutton to enter her home on June 4, 2007, was sufficient to support the verdict, and the fact that the door was unlocked does not establish that Sutton had consent to enter the home. *See Ellett v. State,* 607

12

S.W.2d 545, 549-50 (Tex. Crim. App. 1980). Furthermore, the jury was free to disbelieve King and Fiala and to give no weight to their testimony. A conflict in the evidence does not make the supporting legally or evidence factually insufficient. *See Watson,* 204 S.W.3d at 417; *Prescott v. State,* 610 S.W.2d 760, 763 (Tex. Crim. App. 1981) (holding that evidence was sufficient to support finding that defendant entered without the victim's consent where defendant entered the residence while the victim was sleeping); *Rangel v. State*, 179 S.W.3d 64, 69 (Tex. App.–San Antonio 2005, pet. ref'd) (holding that jury was free to believe victim's testimony that defendant did not have consent to enter the home on the day of the burglary, and to disregard victim's inconsistent testimony that the defendant "always" had permission to enter); *Lagunas v. State*, 187 S.W.3d 503, 521 (Tex. App.–Austin 2005, pet. ref'd) (holding that jury was entitled to believe witnesses who stated that defendant, who was their son-in-law, did not have permission to enter their residence without his wife, their daughter, despite evidence to the contrary). Accordingly, we hold that the evidence was legally and factually sufficient to support the finding that Sutton entered Evelyn's home without her consent.

## C.    Intent

Sutton further argues that the evidence is legally and factually insufficient to show that, at the time he entered Evelyn's residence, he intended to commit the felony of injury to an elderly or aggravated sexual assault. As we noted above, intent may be inferred from the accused's acts, words, and conduct. *See Guevara*, 152 S.W.3d at 50; *Sharpe*, 881 S.W.2d at 489. Evelyn testified that Sutton entered her home in the middle of the night and came to her bedroom. He touched her foot, waking her up, and demanded sex.

13

When Evelyn refused, Sutton assaulted her by hitting her, choking her, and putting his fist in her mouth. Sutton bit Evelyn's left breast, which Brown testified was indicative of a sexual assault. All of this evidence was sufficient to support a finding that Sutton entered the residence with the intent to commit either injury to an elderly or aggravated sexual assault. *See Sharpe*, 881 S.W.2d at 489. Accordingly, we overrule Sutton's first and second issues.

### III. CHARGE ERROR

By his third issue, Sutton argues that the trial court erred by not submitting an instruction to the jury under article 38.23(a) of the Texas Code of Criminal Procedure, which provides:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a). Sutton claims on appeal that Sergeant Orr violated his Fifth Amendment rights by questioning him without first reading him his *Miranda* rights. *See* U.S. CONST. amend V.

"[A]n Article 38.23 instruction must be included in the jury charge only if there is a factual dispute about how the evidence was obtained." *Garza v. State,* 126 S.W.3d 79, 85 (Tex.Crim.App. 2004). "A fact issue about whether evidence was legally obtained may be raised 'from any source, and the evidence may be strong, weak, contradicted,

14

unimpeached, or unbelievable.'" *Id.* (quoting *Wilkerson v. State*, 933 S.W.2d 276, 280 (Tex. App.–Houston [1st Dist.] 1996, pet. ref'd)); *see also Vasquez v. State*, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007).

Sergeant Orr testified that he went onto Sutton's property without a warrant and began questioning him. He stated that he did not read Sutton his *Miranda* rights before he began questioning Sutton because Sutton was not under arrest. None of this testimony was disputed or contradicted by any other evidence presented, and Sutton has not pointed to any factual dispute regarding how Sergeant Orr obtained the evidence he now claims should have been excluded. *See Garza*, 126 S.W.3d at 86. Therefore, Sutton was not entitled to an instruction under article 38.23. *Id.* In the absence of a factual dispute, the question of whether Sergeant Orr violated Sutton's Fifth Amendment rights was a legal question for the trial court to resolve. *Id.* ("The question of whether the search was legal is a question of law, as none of the circumstances surrounding the search were controverted by appellant."). Accordingly, we overrule his third issue.

## IV. CONCLUSION

Having overruled all of Sutton's issues, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
See TEX. R. APP. P. 47.2(b)

Delivered and filed the
8th day of July, 2010.